**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **CRIMINAL ACTION** |
| | ) | |
| v. | ) | No. 05-10050-01-MLB |
| | ) | |
| SCOTT D. CHEEVER, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This case comes before the court on two motions filed by defendant that attack the constitutionality of the Federal Death Penalty Act, 18 U.S.C. §§ 3591 to 3598, and the constitutionality of these proceedings as they relate to the government's efforts to seek the death penalty against him. (Docs. 145, 146.) The government has filed a consolidated response to both motions. (Doc. 191.) No reply has been filed.

**I. INTRODUCTION**

Defendant is charged in a thirteen-count third superseding indictment with crimes arising out of an altercation with law enforcement on or about January 19, 2005. (Doc. 200.) The government claims that defendant and a number of former co-defendants were manufacturing methamphetamine at a rural home in Greenwood County, Kansas. Responding to a tip that defendant was at this residence, Greenwood County Sheriff Matthew Samuels and two deputies went to the house to investigate. Sheriff Samuels entered the house. Shortly thereafter, the government alleges that defendant shot the sheriff twice with a .44 magnum revolver at

close range.  Sheriff Samuels died as a result of those wounds. (Doc. 200.)

Among other offenses, Count Five of the indictment charges defendant with murder through the use of a firearm during the commission of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1), (j)(1).  Count Six charges defendant with murder to prevent a witness from communicating to federal officials information relating to the commission of federal crimes, in violation of 18 U.S.C. § 1512(a)(1)(C).  The government's theory on Count Six is that defendant killed Sheriff Samuels to prevent him from informing federal officials that defendant was a felon in possession of firearms, that he knowingly possessed stolen firearms, and that defendant may have been involved in a bank robbery.  (Doc. 200 at 6.)  The crimes charged in Counts Five and Six each carry a maximum sentence of death.

The government also included in the indictment a section labeled "Notice of Special Findings."  (Doc. 200 at 10.)  In this portion of the indictment, the grand jury returned findings related to the factors set forth in 18 U.S.C. §§ 3591(a) and 3592(c). These sections are contained in Chapter 228 of Title 18, which prescribes procedures for determining whether a defendant should be sentenced to death.  The indictment states that defendant was over 18 years of age at the time of the charged offenses.  This fact is an absolute prerequisite to imposing a death sentence under section 3591(a).  The indictment also charges that defendant had all four of the requisite mental states specified under section 3591(a)(2).  These mental states are often referred to as "gateway

intent factors" because a petit jury must find that a defendant had at least one of these four mental states before it may consider whether to recommend a death sentence.[1]   Finally, the Notice of Special Findings charges three of the statutory aggravating factors listed in section 3592(c): 1) Grave risk of death to additional persons; 2) substantial planning and premeditation; and 3) multiple killings or attempted killings.

Defendant filed a number of motions attacking the procedure followed by the government.   (Docs. 140 through 146.)   This memorandum and order addresses two of those motions, (Docs. 145, 146), which focus sharply on the constitutionality of the Federal Death Penalty Act and on the government's procedure in this case.


## II.   THE FEDERAL DEATH PENALTY ACT

Capital punishment has been an accepted penalty for the most severe crimes since the founding of the Republic.   See generally McGautha v. California, 402 U.S. 183, 197-203, 91 S. Ct. 1454, 1462-65, 28 L. Ed. 2d 711 (1971) (reviewing history of capital punishment from 13th century England through modern era in America); see also Trop v. Dulles, 356 U.S. 86, 99, 78 S. Ct. 590, 597 2 L. Ed. 2d 630 (1958) ("[T]he death penalty has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty."). Nevertheless, in Furman v. Georgia, 408 U.S. 238,

---

[1] The full text of these gateway intent factors is set forth in the court's discussion of the procedure contemplated by the Federal Death Penalty Act, infra.

92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), the Supreme Court upended almost two centuries of death penalty jurisprudence by effectively putting a halt to capital punishment in America.  The Court did not find the death penalty categorically unconstitutional; rather, in a series of concurring opinions in which no two justices joined together, the Court found that the procedures employed to impose the death penalty lacked the standards necessary to guide the sentencing body (whether judge or jury) toward a principled judgment regarding who should be put to death and who should be spared.  See id. at 240 (Douglas, J., concurring); id. at 295 (Brennan, J., concurring); id. at 309-10 (Stewart, J., concurring); id. at 314 (White, J., concurring); id. at 371 (Marshall, J., concurring).[2]  This unbridled discretion allowed capital juries to set their own standards for making this solemn decision, thus rendering the entire process so arbitrary and capricious as to violate the Eighth Amendment.  See Gregg v. Georgia, 428 U.S. 153, 188-89, 96 S. Ct. 2909, 2932, 49 L. Ed. 2d 859 (1976) (plurality opinion) (describing the basis for the decision in Furman).

In response to Furman, many states modified their procedures for administering the death penalty.  In 1976, the Supreme Court reviewed the responses from the states of Georgia, Florida, and Texas.  See id.; Proffitt v. Florida, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976); Jurek v. Texas, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976).  These cases reaffirmed the Court's

---

[2] Justices Brennan and Marshall were prepared to declare the death penalty unconstitutional per se.  Furman, 408 U.S. at 305-06, 370-71.  However, the other three justices who concurred in the judgment were not prepared to go so far.

abhorrence of capital punishment schemes that permit a death sentence to be imposed in an arbitrary, standardless fashion. <u>See</u> <u>Godfrey v. Georgia</u>, 446 U.S. 420, 428, 100 S. Ct. 1759, 1764-65, 64 L. Ed. 2d 398 (1980) (plurality opinion). Accordingly, even sentencing procedures purporting to have standards that were responsive to <u>Furman</u> could be unconstitutional if they failed to

> channel the sentencer's discretion by "clear and objective standards" that provide "specific and detailed guidance," and that "make rationally reviewable the process for imposing a sentence of death." As was made clear in <u>Gregg</u>, a death penalty "system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in <u>Furman</u> could occur." 428 U.S., at 195, n. 46, 96 S. Ct., at 2935.

<u>Id.</u> (quoting <u>Gregg</u>, 428 U.S. at 198, 96 S. Ct. at 2936; <u>Proffitt</u>, 428 U.S. at 253, 96 S. Ct. at 2967; <u>Woodson v. North Carolina</u>, 428 U.S. 280, 303, 96 S. Ct. 2978, 2991, 49 L. Ed. 2d 944 (1976)) (footnotes omitted). Although the Supreme Court concluded that the sentencing procedures employed by Texas, Florida, and Georgia were constitutional, during that same term, the Court also found that mandatory death sentences for certain crimes were unconstitutional, and that the Eighth Amendment required individualized sentencing that considers facts peculiar to the specific defendant and the specific crime under consideration. <u>See</u> <u>Woodson</u>, 428 U.S. at 303-04, 96 S. Ct. at 2991 (plurality opinion); <u>Roberts v. Louisiana</u>, 428 U.S. 325, 333, 96 S. Ct. 3001, 3006, 49 L. Ed. 2d 974 (1976) (plurality opinion).

In the years since <u>Furman</u> and the five capital cases from the

-5-

1976 term, the Supreme Court has revisited its death penalty jurisprudence numerous times. Although its purpose was undoubtedly to refine and clarify the law in this area, the Supreme Court's perpetual tinkering and splintered decisions regarding death penalty law has created a moving target that often changes term-by-term. Sometimes the decisions flow from one another; but on other occasions, what was a well settled rule of law in one decade is found repugnant to the Constitution in the next. Compare Walton v. Arizona, 497 U.S. 639, 647-49, 110 S. Ct. 3047, 3054-55, 111 L. Ed. 2d 511 (1990) (permitting a judge to decide facts that make a defendant eligible for the death penalty), with Ring v. Arizona, 536 U.S. 584, 609, 122 S. Ct. 2428, 2443, 153 L. Ed. 2d 556 (2002) (overruling Walton on this same point); compare South Carolina v. Gathers, 490 U.S. 805, 810-11, 109 S. Ct. 2207, 2210-11, 104 L. Ed. 2d 876 (1989) (holding it unconstitutional to admit evidence of a victim's personal characteristics at the penalty phase of a capital trial), and Booth v. Maryland, 482 U.S. 496, 509, 107 S. Ct. 2529, 2536, 96 L. Ed. 2d 440 (1987) (same), with Payne v. Tennessee, 501 U.S. 808, 828-30, 111 S. Ct. 2597, 2610-11, 115 L. Ed. 2d 720 (1991) (expressly overruling Booth and Gathers on this point). Lower courts administering capital cases are severely burdened with not only understanding the present state of the law, but also divining what it will be next week, next term, or ten years from now when cases presently being tried may still be in the throes of appellate review. Any uncertainty in death penalty cases magnifies the already considerable expenditure of time and resources, not to mention the emotional toll on those involved, particularly at the

trial level.

Amidst this sea of constant change, Congress permitted the death penalty laws in federal cases to remain largely unenforceable for over twenty years following Furman.  See H.R. Rep. No. 103-467 (1994).  Nevertheless, in 1974, Congress did pass an amendment to the Federal Aviation Act of 1958 that authorized the death penalty for certain acts of air piracy that resulted in the death of another person.  Antihijacking Act of 1974, Pub. L. No. 93-366, §§ 103 and 104, 88 Stat. 409 (1974).  That act also prescribed a procedure for determining whether a sentence of death would be imposed that foreshadowed the method at issue in this case.  Id. § 105.  Thereafter, Congress passed the Anti-Drug Abuse Act of 1988, which established a procedure for determining who would be sentenced to death following conviction for certain drug-related killings.  Pub. L. No. 100-690, § 7001, 102 Stat. 4181 (1988) (codified at 21 U.S.C. § 848).  This procedure was a refinement of the one created by the Antihijacking Act of 1974, and is strikingly similar to the method at issue here.  Six years later, Congress passed the Violent Crime Control and Law Enforcement Act of 1994. Pub. L. No. 103-322, 108 Stat. 1796 (1994).  Title VI of that act was denominated the Federal Death Penalty Act of 1994 (FDPA).  Id. § 60001. The FDPA authorized the death penalty for a number of additional federal crimes and established a comprehensive procedure for determining who should receive a death sentence when convicted of those or other crimes for which capital punishment was authorized.  Id. Title VI.  The procedural portion of that act is codified at 18 U.S.C. §§ 3591-3598.

-7-

The FDPA vests discretion in federal prosecutors to determine whether the government will pursue the death penalty for offenses that authorize capital punishment.[3]  18 U.S.C. § 3593(a).  If, in the event of a conviction, the government intends to seek the death penalty, it is required to give notice "a reasonable time before trial" that includes any aggravating factors prosecutors intend to prove as justifying execution.  Id.  If a conviction is obtained on a death-eligible offense, the trial proceeds into the second phase of a bifurcated procedure in which the government must prove a number of additional facts in order to vest the jury with discretion to recommend a death sentence.[4]  Id. § 3593(b).

First, as relevant here, the government must establish that the defendant had the mental state described in at least one of four gateway intent factors, which require proof that the defendant:

> (A) intentionally killed the victim;
> (B) intentionally inflicted serious bodily injury that resulted in the death of the victim;
> (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the

---

[3]  For a similar discussion of the FDPA's procedural requirements, see generally Jones v. United States, 527 U.S. 373, 376-79, 119 S. Ct. 2090, 2096-97, 144 L. Ed. 2d 370 (1999).

[4]  Under the FDPA, the penalty phase may be tried to a jury or to the court.  18 U.S.C. § 3593(b).  In this case, defendant has asserted his right to a jury trial, and in all likelihood, a jury will make sentencing determinations if defendant is convicted of murder.  Accordingly, for sake of brevity, the court will describe the procedure for the use of a jury because it is highly unlikely that Cheever, or any defendant, would consent to have a judge decide whether he should live or die.

> victim died as a direct result of the act; or
> (D) intentionally and specifically engaged in
> an act of violence, knowing that the act
> created a grave risk of death to a person,
> other than one of the participants in the
> offense, such that participation in the act
> constituted a reckless disregard for human life
> and the victim died as a direct result of the
> act.

Id. § 3591(a)(2)(A)-(D).

Next, in order for the jury to consider recommending a sentence of death, the government must prove the existence of at least one statutory aggravating factor enumerated in section 3592(c).  Then, and only then, may the jury weigh the existence of any aggravating factors against any mitigating factors in order to arrive at a recommended sentence.  Id. § 3593(e).  The FDPA further limits the jury's discretion in this matter by stating that, once the initial conditions have been met to begin the weighing process,

> the jury . . . shall consider whether all the
> aggravating factor or factors found to exist
> sufficiently outweigh all the mitigating factor
> or factors found to exist to justify a sentence
> of death, or, in the absence of a mitigating
> factor, whether the aggravating factor or
> factors alone are sufficient to justify a
> sentence of death.

Id.

The FDPA describes the aggravating and mitigating factors in section 3592.  Although the FDPA lists a number of mitigating factors, it makes clear that the defendant may present, and the jury must consider, evidence on any mitigating factor.  Id. § 3592(a).  The act also enumerates several aggravating factors applicable to homicides, such as the one in this case.  Id. § 3592(c).  However, the FDPA also authorizes the jury to consider

-9-

any other aggravating factor for which notice has been given.  Id. These additional aggravating factors are typically referred to as non-statutory aggravating factors.   Jones, 527 U.S. at 378 n.2, 119 S. Ct. at 2097 n.2.

With respect to burdens of proof, the act requires the government to prove to a unanimous jury, beyond a reasonable doubt, the gateway intent factors and any aggravating factors.  18 U.S.C. §§ 3591(a)(2), 3593(c), (d).  By contrast, the burden is on the defendant to prove mitigating factors, but only by a preponderance of the evidence.  Id. § 3593(c).  Moreover, any juror who concludes that the defendant has met his burden of establishing the existence of a mitigating factor may consider that factor in determining what sentence to recommend, notwithstanding the fact that other jurors may not believe that the mitigating factor has been proven - in other words, unanimity is not required for jurors to consider mitigating factors.  Id. § 3593(d).  However, unanimity is required to make a final recommendation regarding what sentence to impose. Id. § 3593(e).

Defendant presents a number of constitutional challenges to the FDPA.  Some of his arguments are facial challenges, while others are based on the manner in which the FDPA is being applied to him.  Acts of Congress are presumed constitutional, and defendant bears the burden of demonstrating that it is not.  See United States v. Dorris, 236 F.3d 582, 584 (10th Cir. 2000).  That burden is particularly high when he makes a facial challenge.  In order to succeed on a facial challenge, defendant must show "that no set of circumstances exists under which the [law] would be

-10-

valid." West v. Derby Unified Sch. Dist. No. 260, 206 F.3d 1358, 1367 (10th Cir. 2000) (quoting United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987)) (alterations in original).  The court will now consider the various arguments that defendant presents on these matters.

III.      CONFLICTS BETWEEN THE FDPA AND THE INDICTMENT CLAUSE

Defendant argues that the procedures set forth in the FDPA are at odds with the requirements of the Indictment Clause of the Fifth Amendment.  In particular, defendant asserts that, based on the Supreme Court's decisions in Ring v. Arizona and Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435(2000), all facts necessary to make him eligible for the death penalty must be charged by the grand jury in the indictment.  (Doc. 145 at 11-13.) However, defendant further argues that the FDPA is irreconcilable with this requirement because it does not authorize the government to include such facts as the gateway intent factors and the statutory aggravating factors in the indictment.  Id. at 14-15. Continuing, defendant argues that the disparity between the process Congress intended in the FDPA and the one required by the Constitution is so great that it is not susceptible to being judicially cured by a saving construction of the FDPA.  Id. at 17-24.


A.   THE FDPA PERMITS THE GOVERNMENT TO ALLEGE GATEWAY INTENT FACTORS AND STATUTORY AGGRAVATING FACTORS IN THE INDICTMENT

In construing an act of Congress, the objective of the court is to give effect to the intent of the enacting body.  See Zadvydas

-11-

v. Davis, 533 U.S. 678, 696, 121 S. Ct. 2491, 2502, 150 L. Ed. 2d 653 (2001).  In so doing, the court will first look to the plain language of the statute.  Robbins v. Chronister, 402 F.3d 1047, 1049 (10th Cir. 2005).  However, when a statute is silent on a particular point, the court will nevertheless interpret the statutory scheme as a whole in order to give effect to the legislative intent, if possible.  See Sierra Club v. El Paso Gold Mines, Inc., 421 F.3d 1133, 1143 (10th Cir. 2005) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)).  Although legislative history may not be the preferred source for identifying the intent of Congress in a particular act, see, e.g., Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 783 n.12, 120 S. Ct. 1858, 1868 n.12, 146 L. Ed. 2d 836 (2000), it may still be helpful in areas where the statutory language is ambiguous or otherwise unenlightening.  See Wyoming v. United States, 279 F.3d 1214, 1230 (10th Cir. 2002). In a case such as this, where one construction of a statute would comport with the Constitution, whereas an alternative construction would be unconstitutional, the court is obligated to adopt the construction that will save the statute, so long as such a construction will not do violence to the intent of Congress.  Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs, 531 U.S. 159, 173, 121 S. Ct. 675, 683, 148 L. Ed. 2d 576 (2001).

In this case, the government included all four of the gateway intent factors and three statutory aggravating factors in the superseding indictments.  (Docs. 78 at 14-16; 104 at 14-16; 200 at 10-12.)  Defendant argues that the FDPA must be construed as

-12-

prohibiting this procedure; therefore, he continues, those factors must be stricken from the indictment. (Doc. 145 at 24-28, 36-37.) The court must resolve this statutory question first because, if (and only if) defendant is correct in his interpretation of the FDPA, then the court will have to determine whether <u>Ring</u> nevertheless requires the gateway intent factors and the statutory aggravating factors to be included in the indictment. If <u>Ring</u> requires that these factors be charged in the indictment, but the FDPA precludes it, then the FDPA will violate the Indictment Clause of the Fifth Amendment. Finding that the FDPA does not prohibit the government from charging these factors in the indictment, the court avoids the constitutional question.

The crux of defendant's argument is that since the FDPA is silent regarding the indictment, but relatively thorough with respect to the rest of the procedure to be followed in a capital case, this evinces Congress' intent to preclude the use of an indictment to charge the gateway intent factors and the statutory aggravating factors. (Doc. 145 at 21, 24-25.) Defendant further argues that the effect of <u>Apprendi</u> and <u>Ring</u> is to make these factors elements of a brand new federal crime called "capital murder."[5] <u>Id.</u> at 13. Conversely, he claims that Congress intended that the gateway intent factors and the statutory aggravating

_____

[5] Defendant bases this argument, at least in part, on the idea that <u>Ring</u> announced a substantive, rather than procedural, rule. (Doc. 145 at 15-16.) The Supreme Court has expressly rejected that conclusion, holding instead that, "<u>Ring</u>'s holding is properly classified as procedural." <u>Schriro v. Summerlin</u>, 542 U.S. 348, 353, 124 S. Ct. 2519, 2523, 159 L. Ed. 2d 442 (2004).

factors should be treated as sentencing factors, not elements of a new crime. Id. at 21. Accordingly, defendant concludes that the new conditions imposed on the federal criminal code as a result of Apprendi and Ring are so vastly different from what Congress envisioned when it enacted the FDPA, that the act cannot be reconciled with constitutional requirements. Id. at 22-24.

These arguments are not new. They have been presented, in one form or another, to several courts since Ring was decided. In every case, the arguments have been rejected. See, e.g., United States v. Allen, 406 F.3d 940, 949 (8th Cir. 2005), petition for cert. filed, (U.S. Sept. 29, 2005) (No. 05-6764); United States v. Barnette, 390 F.3d 775, 788-90 (4th Cir. 2004), vacated ; __ U.S. __, 126 S. Ct. 92, 163 L. Ed. 2d 32 (remanding for reconsideration in light of Miller-El v. Dretke, 545 U.S. __, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005)); United States v. Robinson, 367 F.3d 278, 290 (5th Cir. 2004), cert. denied, 543 U.S. 1005 (2004); United States v. Mayhew, 380 F. Supp. 2d 936, 943 (S.D. Ohio 2005); United States v. Le, 327 F. Supp. 2d 601, 60-10 (E.D. Va. 2004); United States v. Taylor, 302 F. Supp. 2d 901, 904 (N.D. Ind. 2003); United States v. Haynes, 269 F. Supp. 2d 970, 982-83 (W.D. Tenn. 2003); United States v. Acosta-Martinez, 265 F. Supp. 2d 181, 184 (D.P.R. 2003); United States v. Matthews, 246 F. Supp. 2d 137, 146-47 (N.D.N.Y. 2002); United States v. Lentz, 225 F. Supp. 2d 672, 680-81 (E.D. Va. 2002).

In particular, the Supreme Court has stopped short of declaring that the death-eligibility factors are elements of a new crime. Instead, the Court has declared that any fact that

increases the potential penalty faced by a defendant must be treated as "the functional equivalent of an element of a greater offense." <u>Ring</u>, 536 U.S. at 609, 122 S. Ct. at 2443 (quoting <u>Apprendi</u>, 530 U.S. at 494, n. 19, 120 S. Ct. 2348).[6]  The Court tends not to choose such critical words lightly.  Had it intended to change sentencing factors into elements, it could have said so. Rather, the Court chose to use language that requires some facts to be treated as if they were elements.  <u>Id.</u>  This language has been interpreted simply to mean that such facts must be alleged in the indictment and proved to a unanimous jury beyond a reasonable doubt.  <u>See, e.g.</u>, <u>Robinson</u>, 367 F.3d at 284;

<u>United States v. Jones</u>, 235 F.3d 1231, 1236 (10th Cir. 2000) (holding that drug quantity must be included in indictment in order

_____

[6] <u>But see</u> <u>Sattazahn v. Pennsylvania</u>, 537 U.S. 101, 110-13, 123 S. Ct. 732, 739-40, 154 L. Ed. 2d 588 (2003) (Scalia, J.).  In <u>Sattazahn</u>, Justice Scalia was joined by two other justices in a portion of his opinion in which he appeared to interpret <u>Ring</u> as creating distinctly new capital offenses such as "murder plus one or more aggravating circumstances." <u>Id.</u> at 111.  Notably absent from this part of Justice Scalia's opinion is the "functional equivalent" language used in <u>Ring</u> and <u>Apprendi</u>.  Defendant seized on this language and combined it with similar language from a footnote in the dissenting opinion to suggest that seven justices held this view of <u>Ring</u>.  (Doc. 145 at 12-13.)  However, the dissent merely viewed <u>Ring</u> as holding that "capital sentencing proceedings involving proof of one or more aggravating factors are to be <u>treated as</u> trials of separate offenses, not mere sentencing proceedings." <u>Sattazahn</u>, 537 U.S. at 126 n.6, 123 S. Ct. at 747 (Ginsburg, J., dissenting) (emphasis added; other emphasis omitted).  Despite defendant's arguments, the words "treated as" are more in accord with the words "functional equivalent," thus making the dissent's position on this matter at least ambiguous. In any event, this entire discussion is dicta with respect to the Indictment Clause, because <u>Sattazahn</u> was a case analyzing the Double Jeopardy Clause.  While the Tenth Circuit has stated that Supreme Court dicta should generally by followed, <u>United States v. Nelson</u>, 383 F.3d 1227, 1232 (10th Cir. 2004), the foregoing discussion from <u>Sattazahn</u> is simply too ambiguous to rely upon for the questions raised in the present motions.

to expose defendant to risk of longer sentence as result thereof).

Turning to the question of whether the FDPA precludes the government from including the gateway intent factors and the statutory aggravating factors in the indictment, courts resolving this question have found no conflict between the FDPA and the Indictment Clause. See, e.g., Allen, 406 F.3d at 949; Barnette, 390 F.3d at 788-90; Robinson, 367 F.3d at 290. First, it can be a dangerous proposition to interpret a statute by what it does not say. Brown v. Gardner, 513 U.S. 115, 121, 115 S. Ct. 552, 557, 130 L. Ed. 2d 462 (1994) ("[C]ongressional silence lacks persuasive significance." (Quotations omitted)). Such a negative inference is a weak indicator of legislative intent.

Moreover, the court notes that the FDPA does not purport to abrogate the remainder of the criminal code as it relates to criminal procedure. Thus, the provisions of the FDPA must be considered in light of the entire procedural code. In particular, 18 U.S.C. § 3361, relating to indictments, refers the reader to the Federal Rules of Criminal Procedure. Rule 7 directs the government to include in the indictment "the essential facts constituting the offense charged." Defendant argues that this language is not broad enough to authorize inclusion of the gateway intent factors or the statutory aggravating factors.[7] (Doc. 145 at 24.) However, under

---

[7] Defendant attempts to bolster this argument with the specific claim that a grand jury is not authorized to return a "Notice of Special Findings," which is how the government denominated the portion of the indictment that charged the gateway intent factors and the statutory aggravating factors. (Doc. 145 at 24.) The court rejects this distinction, finding that the label placed on these facts is inconsequential. They fall within the ambit of "essential facts" contemplated by Rule 7 and will not be

his reading of <u>Ring</u>, these factors are precisely the type of "essential facts" that should be included in the indictment under Rule 7.    And even though the court rejects defendant's interpretation of <u>Ring</u>, assuming the gateway intent factors and the statutory aggravating factors must be treated as the functional equivalent of elements, they would clearly fall within the realm of essential facts contemplated by Rule 7.

Furthermore, the court rejects defendant's assertion that Congress was necessarily legislating toward the minimum constitutional requirements when it passed the FDPA. (Doc. 145 at 21-22.)  Specifically, defendant argues that Congress enacted the FDPA in light of the Supreme Court's holding in <u>Walton</u>, which authorized judge-found sentencing factors that made a defendant eligible for the death penalty.  <u>Id.</u>  However, the court is not so quick to assume that Congress automatically legislates down to the bare minimum required by the Constitution.  Congress is not a ward of the courts.  As a co-equal branch of our tripartite government, Congress, as much as the other branches, has a duty to uphold the Constitution.  The federal courts are not the sole guardians of the rights enumerated therein.  Sometimes Congress may view the Constitution as affording greater protections to individual rights than what has been articulated by the courts.

For example, at least as far back as 1974, Congress concluded that it was inappropriate to execute persons for crimes committed prior to reaching the age of 18.  Antihijacking Act of 1974, Pub.

_____

stricken from the indictment on this basis.

L. No. 93-366, § 105, 88 Stat. 409. That protection was continued in both the Anti-Drug Abuse Act of 1988 and the FDPA. See 18 U.S.C. § 3591(a); 21 U.S.C. § 848(l). By contrast, it took the Supreme Court an additional 31 years, until 2005, to conclude that it was unconstitutional to impose capital punishment on persons for crimes committed before turning 18. Roper v. Simmons, 543 U.S. 551, __ , 125 S. Ct. 1183, 1197-98, 161 L. Ed. 2d 1 (2005).

Turning to the FDPA, itself, the legislative history of the act is silent regarding Walton. On the other hand, two reports from the House of Representatives Committee on the Judiciary specifically addressed other Supreme Court cases that Congress had in mind when enacting the FDPA. See H.R. Rep. No. 103-466 (1994) (discussing Furman, Enmund v. Florida, 458 U.S. 782 (1982), and Tison v. Arizona, 481 U.S. 137 (1987)); H.R. Rep. No. 103-467 (1994) (discussing Furman, Gregg, Blystone v. Pennsylvania, 494 U.S. 299 (1990), Boyde v. California, 494 U.S. 370 (1990), and Lowenfield v. Phelps, 484 U.S. 231 (1988)).[8] Nevertheless, the court is cautious about relying on what the legislative reports do not say, just as it is cautious about relying on what the FDPA does not say regarding the use of indictments. What House Report No. 103-467 does contain is a minority statement from a number of representative who opposed the FDPA. These members specifically upbraided their majority colleagues for affording more protections

---

[8] Blystone, Boyde, and Lowenfield were discussed in a dissenting statement by a minority of representatives who opposed the legislation as written. Nevertheless, it is clear that they were included in the debate surrounding the extent of protections that Congress intended to afford defendants facing capital punishment under the FDPA.

to a capital defendant than the Constitution requires.  While a minority statement is by no means authoritative, it certainly suggests that some members of Congress felt the FDPA goes too far in protecting the rights of defendants charged with a death-eligible offense.

Finally, the court looks at the substantive rights granted to defendants in the FDPA.  These include the right to have the death-eligibility factors and all aggravating factors proved to a jury.  18 U.S.C. § 3593(b).  The burden is on the government to prove these facts beyond a reasonable doubt, id. §§ 3591(a)(2), 3593(c)(2), and the jury must unanimously agree that the factors have been so proved.  Id. § 3593(d).  Last of all, the jury must unanimously agree on the recommended punishment.  Id. § 3593(e).

These rights extend far beyond the protections mandated by Walton.  Indeed, they sound a lot like the Sixth Amendment protections applicable to elements of a crime.  Accordingly, it appears that Congress may well have intended to go further than the constitutional minimums set by Walton, and instead intended that these sentencing factors be treated as the "functional equivalent" of elements, even though that particular phrase had not yet been coined in a Supreme Court opinion when the FDPA was enacted.

Ultimately, the court declines to make a specific finding as to what Congress intended on this point.  Instead, the court merely notes that it is defendant's burden to prove that the FDPA is unconstitutional in light of Ring.  Based on the foregoing discussion, the court finds that defendant has failed to meet his burden to show that Congress intended to preclude the use of an

indictment to charge the gateway intent factors and the statutory aggravating factors. Since the FDPA does not expressly preclude use of the indictment, and since Rule 7 directs that essential facts be included in the indictment, the court harmonizes those two provisions to authorize the government to include these death-eligibility factors in the indictment, as it has done here. While Congress may not have foreseen the turnaround in capital jurisprudence that has now taken place, it seems more plausible that Congress intended that the FDPA should be sufficiently flexible to adapt to such changes, rather than intending the act to be an immovable barrier designed to trample any attempts at extending constitutional protections to the accused. Since constitutional protections trump statutory protections, it makes sense that the government's election to charge the gateway intent factors and the statutory aggravators in the indictment is the best way to protect defendant's constitutional rights.

B.   MISCELLANEOUS ARGUMENTS REJECTED[9]

Having found that the FDPA and Federal Rule of Criminal Procedure 7 permit the government to charge gateway intent factors and statutory aggravating factors in the indictment, several of defendant's additional arguments are implicitly rejected. These include his arguments regarding separation of powers, the non-

---

[9]   The court is sensitive to defendant's counsels' responsibility to raise every conceivable argument on defendant's behalf and does not fault them for doing so. Given the ever-changing nature of death penalty jurisprudence, the court understands counsels' need to "make a record" for purposes of appeal. The parties may assume that every issue has been considered, but the interests of justice do not require every issue to be extensively discussed.

delegation doctrine, the implications of <u>United States v. Jackson</u>, severability, and problems related to the role of the grand jury. (Doc. 145 at 15-28.)  Other courts considering some of these same arguments have likewise rejected them.  <u>See, e.g.,</u> <u>United States v. Jordan</u>, 357 F. Supp. 2d 889, 894 (E.D. Va. 2005) (separation of powers); <u>United States v. Haynes</u>, 269 F. Supp. 2d 970, 972-73, 979-83 (W.D. Tenn. 2003) (<u>United States v. Jackson</u> issue and grand jury problems); <u>see also</u> <u>United States v. McCullah</u>, 76 F.3d 1087, 1106-07 (10th Cir. 1996) (rejecting similar challenges to the death penalty scheme under 21 U.S.C. § 848).  However, the court finds that two issues raised by defendant merit further discussion.

1.  Relaxed Evidentiary Standard

First, defendant claims that the FDPA violates his right to due process because it employs a relaxed evidentiary standard at the sentencing phase. (Doc. 145 at 28-34.)  Specifically, the FDPA provides that "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  18 U.S.C. § 3593(c).  Defendant argues that the FDPA's failure to make the Federal Rules of Evidence applicable during the sentencing phase renders the act unconstitutional.

Contrary to defendant's suggestion, the Constitution does not mandate application of the Rules of Evidence.  See <u>United States</u>

v. Fell, 360 F.3d 135, 138, 144-45 (2d Cir. 2004).[10] Constitutional requirements regarding the admission of evidence exist separate and apart from mere evidentiary rules. Id.; see also H.R. Rep. No. 93-1597 (1974), as reprinted in 1974 U.S.C.C.A.N. 7098, 7105-06 (discussing 1974 amendments to Federal Rule of Evidence 804(b)(3) and noting "the general approach in the Rules of Evidence [is] to avoid attempting to codify constitutional evidentiary principles.") Indeed, the court routinely considers both the Constitution and the Federal Rules of Evidence when making evidentiary rulings, particularly during criminal trials. In fact, sometimes the requirements of these two bodies of law conflict, in which case the constitutional requirements control the outcome. This principle is clearly shown in Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), a case upon which defendant relies heavily. However, the court finds that Crawford weighs strongly against defendant on this point.

In Crawford, the Supreme Court considered arguments that Washington Rule of Evidence 804(b)(3) clashed with the Sixth Amendment's Confrontation Clause. Washington's rule allowed the trial judge to admit hearsay statements when the declarant was

---

[10] Defendant argues that Fell was overruled by Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). While Crawford did foreclose Fell's suggestion that the trial judge could admit testimonial hearsay if the court found the evidence would not unfairly prejudice the defendant, Fell, 360 F.3d at 145, Crawford did not reject Fell's conclusion that the Federal Rules of Evidence were not constitutionally mandated during the penalty phase of a federal death penalty case. Indeed, as discussed infra, Crawford resoundingly affirmed Fell's premise that the Constitution provides an independent set of evidentiary standards that apply without regard to the Federal Rules of Evidence.

unavailable, the statement was made against interest, and where "corroborating circumstances clearly indicate the trustworthiness of the statement." The Court found that a conflict existed between Washington Rule 804(b)(3) and the Confrontation Clause when the hearsay statement was testimonial in nature, and that the Confrontation Clause trumped the state evidentiary rule. See Crawford, 541 U.S. at 61, 124 S. Ct. at 1370.

Washington's Rule 804(b)(3) is, in all respects relevant here, indistinguishable from Federal Rule of Evidence 804(b)(3). Thus, the lesson from Crawford that forecloses defendant's argument is that the Constitution includes its own set of evidentiary rules, and therefore does not rely on the Federal Rules of Evidence to make a particular proceeding constitutional. The fact that 18 U.S.C. § 3593(c) makes the Federal Rules of Evidence inapplicable during the sentencing phase of a capital case does not strip defendant of any constitutional protections. The court will endeavor to ensure, as it always does, that any evidence admitted meets constitutional standards.

Moreover, a closer reading of section 3593(c) shows that it affords defendant more protection than he would receive under the Federal Rules of Evidence.[11]   Under Rule 403, the court is only authorized to exclude relevant evidence if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless

---

[11] Defendant concedes this point in a separate part of his brief. (Doc. 145 at 52.)

presentation of cumulative evidence." By contrast, section 3593(c) authorizes exclusion of evidence if it is merely "outweighed by" similar concerns of unfair prejudice and confusion.  Defendant's burden of showing unfair prejudice and the like is unmistakably lower under 3593(c) than under Rule 403 by virtue of the fact that Congress chose to omit the word "substantially" from the burden established under the FDPA.  See Fell, 360 F.3d at 145.

Finally, the Supreme Court has made clear that more is generally better when it comes to the quantity of evidence that a jury should be permitted to consider when making a decision regarding whether to recommend a death sentence.  Gregg, 428 U.S. at 203-04, 96 S. Ct. at 2939.  This principle is embodied in the FDPA wherein a defendant is given the right to put forth virtually anything as a mitigating factor.  18 U.S.C. § 3592(a).  If the Federal Rules of Evidence applied at the sentencing phase, it is arguable that some of defendant's mitigating evidence might be excluded as irrelevant, particularly evidence relating to his childhood and family background.  See United States v. Sampson, 275 F. Supp. 2d 49, 94 (D. Mass. 2003).  The Court finds that the relaxed evidentiary standard under the FDPA does not render the act unconstitutional.  Accord Fell, 360 F.3d at 145-46; United States v. Lee, 374 F.3d 637, 648 (8th Cir. 2004);

Jones, 132 F.3d at 241; Le, 327 F. Supp. 2d at 607-08; United States v. Rodriguez, 380 F. Supp. 2d 1041, 1054 (D.N.D. 2005).

2.  The Presumption of Innocence

For his final argument regarding the constitutionality of the FDPA, defendant argues that the act deprives him of the presumption

-24-

of innocence, thereby violating his constitutional right to a fair trial.[12]   (Doc. 145 at 35.)

> It is now generally recognized that the "presumption of innocence" is an inaccurate, shorthand description of the right of the accused to "remain inactive and secure, until the prosecution has taken up its burden and produced evidence and effected persuasion; i. e., to say in this case, as in any other, that the opponent of a claim or charge is presumed not to be guilty is to say in another form that the proponent of the claim or charge must evidence it." Wigmore 407. The principal inaccuracy is the fact that it is not technically a "presumption"—a mandatory inference drawn from a fact in evidence. Instead, it is better characterized as an "assumption" that is indulged in the absence of contrary evidence. Carr v. State, 192 Miss. 152, 156, 4 So. 2d 887, 888 (1941); accord, McCormick 806.

Taylor v. Kentucky, 436 U.S. 478, 483 n.12, 98 S. Ct. 1930, 1934, 56 L. Ed. 2d 468 (1978). The use of the phrase "presumption of innocence" is not constitutionally mandated. Id. at 485, 98 S. Ct. at 1935; see also Victor v. Nebraska, 511 U.S. 1, 5, 114 S. Ct. 1239, 1243, 127 L. Ed. 2d 583 (1994). However, when the entirety of the jury instructions are inadequate to convey the fact that it is the prosecution's duty, if it can, to prove defendant's guilt beyond a reasonable doubt, and that defendant has no burden to prove anything, then a failure to instruct on the presumption of innocence may violate a defendant's right to a fair trial. See id. at 486-87, 98 S. Ct. at 1935. By contrast, when the "totality of

---

[12] Defendant claims that under the FDPA, not only is he deprived of the presumption of innocence, but the jury is "told the defendant is guilty." (Doc. 145 at 35.) On the contrary, the jury is not told the defendant is guilty. If the case proceeds to a penalty phase, it will be because the jury has found defendant guilty on at least one of the murder counts.

the circumstances--including all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors," show that a defendant had a fair trial, a failure to instruction on the presumption of innocence does not violate the Constitution. Kentucky v. Whorton, 441 U.S. 786, 789, 99 S. Ct. 2088, 2090, 60 L. Ed. 2d 640 (1979) (per curiam); see also Delo v. Lashley, 507 U.S. 272, 278, 113 S. Ct. 1222, 1226, 122 L. Ed. 2d 620 (1993)

The Supreme Court has noted that an instruction on the presumption of innocence is somewhat redundant if a jury is instructed on the government's burden of proof beyond a reasonable doubt. See Taylor, 436 U.S. at 484-85, 98 S. Ct. at 1934. However, the Court also observed that such an instruction can help a lay juror's understanding of the government's burden and the defendant's corresponding lack of a duty to prove anything. Id.

In this case, rather than help the jury as in Taylor, an instruction on the presumption of innocence at the penalty phase would, in fact, cause the jury more confusion. The confusion arises from the fact that, at the penalty phase of an FDPA proceeding, the jury has already found the defendant guilty of the underlying murder charge. Thus, this would seem to be one of the most inappropriate times to use an "inaccurate shorthand description" to instruct a jury. Id. at 483 n.12, 98 S. Ct. 1934 n.12. Such a charge would tell the jury that this guilty person is still somehow presumed innocent. Innocent of what? The jury's decision - life or death - would have no rational connection to the

-26-

concept of innocence, which means freedom from guilt. Such an instruction would then necessarily give rise to some other instruction that endeavors to explain what it means for a guilty person to be considered innocent and how the jury is to perform the mental gymnastics necessary to meaningfully employ that presumption in its deliberations.

From the abundance of cases analyzing death penalty issues, defendant cites not a single authority for his proposition or how it can be practically employed. Nor does he propose language for and instruction. Based on <u>Taylor</u>, the court finds that the better course is to avoid the "inaccurate shorthand" associated with the presumption of innocence. Instead, if this case proceeds to a penalty phase, the jury will be instructed in no uncertain terms that it is the government's burden to prove, if it can, to a unanimous jury beyond a reasonable doubt everything required to make defendant eligible for the death penalty, and everything required for the jury to return a recommendation of death, as contemplated by both the FDPA and the Constitution. The jury will also be instructed in unequivocal terms that defendant has no burden or duty to prove anything (unless, or course, defendant elects to present evidence in mitigation, in which case the jury will be instructed on the preponderance standard, lack of a unanimity requirement to consider mitigating factors, etc.). Under those circumstances, defendant will not be deprived of his constitutional right to a fair trial.

## IV. GATEWAY INTENT FACTORS

Defendant next argues that the gateway intent factors must be

stricken from the notice of intent to seek the death penalty (NOI) because the government alleged all four of the requisite mental states.  (Doc. 145 at 37.)  In the alternative, defendant argues that the government must be forced to elect one of the mental states and dismiss the other three.  Id. at 38.  He bases his argument on the theory that by alleging all four mental states, the government has deprived the gateway intent factors of their ability to perform the required constitutional narrowing function of determining who is eligible for the death penalty.  Id.  He further argues that by alleging all four mental states, the government deprives him of notice of the mental states that he will be required to defend against, and it promotes an unconstitutional skewing of the weighing process by placing duplicative aggravating factors before the jury.  Id. at 38, 42.

A.  FAILURE TO NARROW

    Defendant's narrowing argument is foreclosed by McCullah.  In McCullah, the Tenth Circuit analyzed a death penalty case under 21 U.S.C. § 848.  The similarities between section 848 and the FDPA dictate the result in this case.  In order for a defendant to be eligible for the death penalty under section 848, the sentencing jury must first find that he had at least one of four mental states.  21 U.S.C. § 848(k), (n)(1).  These mental states are, as relevant here, identical to the mental states contained in the FDPA's gateway intent factors.  Compare 21 U.S.C. § 848(n)(1), with 18 U.S.C. § 3591(a)(2).

    In McCullah, the defendant argued that the factors set forth in section 848(n)(1) failed to perform the constitutionally

mandated narrowing function. <u>McCullah</u>, 76 F.3d at 1109.  The Tenth Circuit rejected this argument, concluding that the narrowing function could be performed by the statute alone, or in combination with other aggravating factors.[13]  <u>Id.</u> at 1109-10.  If the statute defining the offense of conviction accomplished the necessary degree of narrowing, neither the intent factors nor the other aggravating factors needed to perform that function.  <u>See id.</u>  The Court of Appeals went on to conclude that section 848(e), which limited the field of death eligible murders to those accomplished in furtherance of a continuing criminal enterprise or similar offense, was alone sufficient to perform the required narrowing. <u>Id.</u> at 1109.  Moreover, the court found that additional narrowing was accomplished by the requirement that a jury find not only a mental state described in section 848(n)(1), but also one of the additional statutory aggravating factors listed in sections 848(n)(2)-(n)(12), such that any doubts about whether section 848(e) was sufficiently narrow on its own were really beyond dispute.  <u>Id.</u> ("The narrowing functions of §§ 848(e) and 848(k) clearly satisfy the constitutional requirements of <u>Lowenfield</u>[ v. <u>Phelps</u>, 484 U.S. 231, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988)].")

_____

    [13] This conclusion is consistent with the Supreme Court's guidance in <u>Jones</u>, which stated that it was the capital sentencing <u>scheme</u> that must perform the required narrowing function.  527 U.S. at 381, 119 S.Ct. at 2098.  This focus on the entire scheme, including the underlying substantive offenses, means that no particular part of the scheme must perform the narrowing function so long as the sentencing scheme as a whole sufficiently narrows the universe of death-eligible offenses.  <u>Cf.</u> <u>McCullah</u>, 76 F.3d at 1110 (rejecting argument that <u>Arave v. Creech</u>, 507 U.S. 463, 113 S. Ct. 1534, 123 L. Ed. 2d 188 (1993), mandated that aggravating factors play a narrowing role in all capital sentencing schemes).

In this case, defendant is charged under two separate statutes that carry a potential death sentence. Count Five of the indictment charges him with murder through the use of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1) and (j)(1). (Doc. 200 at 5.) A look at the statutory scheme involved in obtaining a conviction under Count Five shows the extraordinary degree of narrowing accomplished by the statutes themselves, before resort to the FDPA's gateway intent factors and statutory aggravating factors even occurs.

In order to obtain a conviction under Count Five that would expose defendant to a potential death sentence, the government must first prove a violation of 18 U.S.C. § 924(c)(1). That statute proscribes, in relevant part, the use of a firearm during a drug trafficking crime. 18 U.S.C. § 924(c)(1)(A). A drug trafficking crime is defined in part as "any felony punishable under the Controlled Substances Act (21 U.S.C. § 801 et seq.)." The indictment charges that the predicate drug trafficking crime is the attempted manufacture of methamphetamine in violation of 21 U.S.C. §§ 846 and 841(a)(1). (Doc. 200 at 4-5.) If the government can prove the defendant used a firearm during a drug trafficking crime, the focus then shifts to section 924(j)(1), which authorizes a potential death sentence if the use of the firearm caused the death of another person, and that killing would amount to murder under the general murder statute, 18 U.S.C. § 1111.

This statutory scheme takes the universe of all murders and murderers, circumscribed by 18 U.S.C. § 1111, and narrows it substantially. It begins by limiting the death penalty to those

murders committed with a firearm.   The pool is further reduced by limiting death eligible offenses to those committed during or in relation to a drug trafficking offense.   The court finds that this statutory scheme, like the one in <u>McCullah</u>, is sufficient by itself to accomplish the narrowing function required by the Constitution. Furthermore, even if this scheme is not sufficient on its own, the additional narrowing accomplished by the requirement that the sentencing jury find at least one statutory aggravating factor before it may consider recommending the death penalty, 18 U.S.C. § 3593(e)(2), is sufficient to satisfy constitutional concerns.[14] <u>Accord</u> <u>Le</u>, 327 F. Supp. 2d at 608-09.   Thus, the court need not decide whether the gateway intent factors, either alone or in tandem, perform any narrowing whatsoever.[15]

Similarly, the offense charged in Count Six of the indictment is significantly narrower than the universe of all murders contemplated under the general murder statute, 18 U.S.C. § 1111. Count Six charges defendant with murder under 18 U.S.C. § 1512(a)(1)(C).   That section states that

---

[14] This conclusion is based on finding that the statutory aggravating factors perform further narrowing, which is discussed in more detail, <u>infra</u>.

[15] In <u>United States v. Webster</u>, 162 F.3d 308 (5th Cir. 1998), the Fifth Circuit concluded that the gateway intent factors were not intended to perform a narrowing function.   <u>Id.</u> at 355. Instead, they were included in the FDPA to meet the requirements set forth in <u>Enmund v. Florida</u>, 458 U.S. 782, 797, 102 S. Ct. 3368, , 73 L. Ed. 2d 1140 (1982) and <u>Tison v. Arizona</u>, 481 U.S. 137, 157, 107 S. Ct. 1676, 1688, 95 L. Ed. 2d 127 (1987) that a capital defendant must have a sufficiently culpable mental state to be eligible for the death penalty.   <u>Id.</u>   The narrowing function under the FDPA is performed by the aggravating factors, not the gateway intent factors.   <u>See id.</u>

-31-

> Whoever kills or attempts to kill another
> person, with intent to . . . prevent the
> communication by any person to a law
> enforcement officer or judge of the United
> States of information relating to the
> commission or possible commission of a Federal
> offense . . . shall be punished as provided in
> paragraph (3).

Subparagraph (3)(A) goes on to state

> The punishment for an offense under this
> subsection is . . . in the case of murder (as
> defined in section 1111), the death penalty or
> imprisonment for life.

Thus, the offense charged in Count Six begins with the definition
of murder under 18 U.S.C. § 1111, and then narrows that definition
to an extraordinary degree by requiring proof that the murder was
committed for the purpose of preventing the victim from
communicating to federal officials information relating to the
defendant's involvement in a federal crime.

Like the offense charged in Count Five, the court finds that
the murder charge in Count Six is based on a statute that itself
is sufficiently specific to satisfy the constitutional narrowing
requirement.   In the alternative, the court finds that the
combination of this statutory definition of murder and the
statutory aggravating factors alleged in this case is sufficient
to perform the required narrowing.   Therefore, there is no need to
consider whether the gateway intent factors perform any narrowing
at all.

B.  DUPLICATION OF AGGRAVATING FACTORS

The court now turns to defendant's argument that permitting
the government to allege all four mental states described by the
gateway intent factors works an unconstitutional duplication of

-32-

aggravating factors. (Doc. 145 at 39-42.) Defendant relies heavily on McCullah's conclusion that alleging multiple mental states under 21 U.S.C. § 848(n)(1) led to an unconstitutional skewing of the weighing process. McCullah, 76 F.3d at 1111-12. However, this particular argument is foreclosed not by the similarities between section 848 and the FDPA, but by the differences.

Under section 848, the subsection (n)(1) mental states are also treated as aggravating factors that the jury can consider in determining whether to recommend a death sentence. In McCullah, the government alleged that the defendant had two of the mental states described in section 848(n)(1): 1) that the defendant "intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim," 21 U.S.C. § 848(n)(1)(C); and, 2) that the defendant

> intentionally engaged in conduct which--
> (i) the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and
> (ii) resulted in the death of the victim.

Id. § 848(n)(1)(D).

The Court of Appeals concluded that the (n)(1)(C) factor "necessarily subsume[d]" the (n)(1)(D) factor. McCullah, 76 F.3d at 1111. Since these mental states were not only eligibility factors, but also aggravating factors that played a role in the jury's ultimate decision regarding a death sentence, McCullah found that this overlap resulted in "double counting of aggravating factors," which "has a tendency to skew the weighing process and

-33-

creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally."[16]  Id.  Later cases have clarified that the key prerequisite for finding an aggravator unconstitutionally duplicative is that it is "necessarily subsume[d]" by another aggravating factor.  Cooks v. Ward, 165 F.3d 1283, 1289 (10th Cir. 1998).

Unlike section 848, the gateway intent factors under the FDPA are not treated as aggravating factors that the jury is permitted to weigh in making a sentencing recommendation.  See 18 U.S.C. § 3593(e).  Instead, the gateway intent factors are mere eligibility factors.  The jury must find at least one in order for it to even consider recommending a death sentence.  However, once the jury finds that one of these mental states existed, the role of the gateway intent factors is complete, and the jury may not consider those factors in any of its subsequent findings.[17]  Accordingly,

_____

[16] Under the Supreme Court's parlance, eligibility factors are those factors which a jury considers to determine whether a capital defendant is eligible for the death penalty.  Brown v. Sanders, __U.S. __, 126 S. Ct. 884, 889 n.2 (2006).  Sentencing factors (also referred to as selection factors) are those factors that the jury considers in determining whether to actually recommend a death sentence.  See Tuilaepa v. California, 512 U.S. 967, 973, 114 S. Ct. 2630, 2635, 129 L. Ed. 2d 750 (1994).  A factor may be a sentencing factor, an eligibility factor, or both, depending on the procedure defined in the relevant capital sentencing scheme.  See Sanders, 126 S. Ct. at 892.


[17] This interpretation of the role of gateway intent factors under the FDPA is made crystal clear in the recently published Pattern Jury Instructions, Criminal Cases, Tenth Circuit, 342-43 (2005), upon which the court will be relying during this case. These instructions are available for download from the Tenth Circuit website, http://www.ca10.uscourts.gov/rules.cfm.  Included in this publication is a section devoted to death penalty cases brought under the FDPA.  See id. at 333.  Instruction No. 3.06

even if one gateway intent factor "necessarily subsumes" another, McCullah, 76 F.3d at 1111, this cannot lead to an unconstitutional duplication of aggravating factors with concomitant skewed weighing because the gateway intent factors are not aggravating factors - they have no role in the weighing process through which the jury makes its ultimate sentencing recommendation.

Defendant acknowledges this interpretation of the statutory scheme; however, he asserts that, human nature being what it is, capital jurors could not possibly put these duplicative factors out of their minds. (Doc. 145 at 39 n.16.) In other words, defendant argues, the jurors will likely consider the gateway intent factors for an unauthorized purpose - making a sentencing recommendation - and thus the improper aggregation of factors condemned in

---

governs the gateway intent factors. <u>Id.</u> at 342. Comment One to that pattern instruction states, in relevant part:

> <u>These intent findings are, in the section 3591 context, conditions of eligibility and not aggravating factors to be considered in the weighing process</u> - as the intent requirements are in death penalty cases under the continuing criminal enterprise statute, 21 U.S.C. section 848(k). In section 848 cases, there is a concern that allowing multiple intent findings could create a set of duplicative aggravating factors that will accumulate on the aggravation side of the scale and unconstitutionally skew the weighing process in favor of the death penalty. <u>See, e.g.</u>, <u>United States v. McCullah</u>, 87 F.3d 1136, 1137-38 (10th Cir. 1996) (on denial of reh'g). <u>While the eligibility factors in section 3591 cases do not present this difficulty</u>, it may be prudent to suggest that the court instruct only on those intent findings that are clearly supported by the evidence, to avoid unnecessarily stacking the deck against the defendant.

<u>Id.</u> at 343 (emphasis added).

-35-

McCullah would nevertheless occur.   Id.

Our entire system of justice is premised on the idea that jurors can and will follow instructions.   See United States v. Lampley, 127 F.3d 1231, 1238 (10th Cir. 1997) (quoting Richardson v. Marsh, 481 U.S. 200, 206, 107 S. Ct. 1702, 1706-07, 95 L. Ed. 2d 176 (1987)).   The court is committed to providing the jurors with clear instructions on the proper use of all the various elements under the FDPA, including the gateway intent factors, mitigating factors, statutory aggravating factors, and non-statutory aggravating factors.   The jury will be told what they can and cannot do with each of these factors.   The law presumes the jurors will follows those instructions.   Defendant's arguments to the contrary are rejected.

C.   DENIAL OF FAIR NOTICE

For his final argument regarding the gateway intent factors, defendant claims that by alleging all four mental states, the government denies him fair notice of elements against which he must defend.   (Doc. 145 at 42.)   However, the government's response makes clear that it is simply focused on defendant's mental state at the time he allegedly shot Sheriff Samuels.   (Doc. 191 at 33-34.)   In that regard, it is no mystery to defendant or anyone else as to what "elements" he will be required to defend against.   The government will attempt to prove to the jury that defendant "intentionally killed the victim."   18 U.S.C. § 3591(a)(2)(A).   It will argue alternatively that, if the jury is not convinced defendant intended to kill the Sheriff, then the evidence proves he "intentionally inflicted serious bodily injury that resulted in

the death of the victim." _Id._ § 3591(a)(2)(B).  If the jury does not believe that argument, the government will resort to the mental state under section 3591(a)(2)(C), and ultimately, if necessary, section 3591(a)(2)(D).

The gateway intent factors set forth in section 3591(a)(2) can generally be described as listing in descending order of culpability those mental states that would satisfy constitutional concerns for imposing the death penalty.  The first two factors describe a person who personally brings about the death of another while intending to do so, or at least intending to inflict life threatening wounds.  _Id._ §§ 3591(a)(2)(A)-(B).  The third factor describes a person who intentionally involves himself in an act knowing that _someone_, though not necessarily the actual victim, would be killed or subjected to lethal force.  _Id._ § 3591(a)(2)(C). And finally, the fourth factor describes a person who intentionally engages in violent conduct that _could_ kill someone, and death results, such that the perpetrator's actions demonstrated such a degree of criminal negligence that it can be fairly characterized as "reckless disregard for human life."  _Id._ § 3591(a)(2)(D).[18]

It is patently obvious from the indictment, the NOI, and the government's response to this motion that the prosecution simply intends to present alternative arguments to the jury that when defendant shot the sheriff, defendant exhibited a degree of mental culpability sufficient to satisfy at least one of the gateway

---

[18] This description of the mental states is intended to be illustrative, not exhaustive.  Thus, the examples should not be interpreted as foreclosing other circumstances that would satisfy the requirements of one or more of these mental states.

intent factors.   If the evidence is sufficient to submit those
alternative theories to the jury, then the court will do so.   Just
as in any other case, if the government fails to present evidence
from which a reasonable juror could find that a particular mental
state existed, the jury will not be instructed on that mental
state, and will not be permitted to return a finding thereon.[19]   The
court finds that defendant has sufficient notice of the facts
underlying the government's theories on his mental state that
defendant can defend himself at trial.

## V.   STATUTORY AGGRAVATING FACTORS

Defendant's next request is for the court to dismiss all the
statutory aggravating factors because they fail to perform the
constitutional narrowing function, because they are vague or
overbroad, and/or because they are not supported by the facts.
(Doc. 145 at 43.)

The purpose of aggravating factors in a capital sentencing
scheme like the FDPA is to narrow the universe of murderers who are
eligible for the death penalty and to channel the sentencer's

---

[19]   Indeed, the Tenth Circuit's Criminal Pattern Jury
Instruction 3.06 specifically contemplates that the jury will be
instructed on all four mental states.   <u>See</u> <u>Pattern Jury</u>
<u>Instructions, Criminal Cases, Tenth Circuit</u>, 342-43 (2005).   As
previously noted, Comment One to that instruction says, "[I]t may
be prudent to suggest that the court
instruct only on those intent findings that are clearly supported
by
the evidence, to avoid unnecessarily stacking the deck against the
defendant."   This note recognizes the general rule that the jury
will be instructed on all the gateway intent factors, subject to
the exception that the court not instruct on any factor for which
the government fails to meets its burden to provide sufficient
evidence from which a jury could find beyond a reasonable doubt
that such a factor had been proven.

discretion in determining whether to recommend a death sentence.[20]
See Lowenfield, 484 U.S. at 244, 108 S. Ct. at 554.  To that end,
aggravating factors must provide the jury with clear, objective
descriptions of those circumstances that distinguish murderers who
should be executed from those who should be spared.  See Lewis v.
Jeffers, 497 U.S. 764, 774, 110 S. Ct. 3092, 3099, 111 L. Ed. 2d
606 (1990).  Consequently, aggravating factors cannot be defined
in vague or overly broad terms such that the sentencer is vested
with so much discretion that it may recommend the death penalty
arbitrarily.  Proffitt, 428 U.S. at 254 n.11, 96 S. Ct. 2960, 2967;
see also Duvall v. Reynolds, 139 F.3d 768, 792 (10th Cir. 1998).
Instead, the aggravating factors must channel the sentencer's
discretion and guide that body through the process of rendering a
recommendation regarding appropriate punishment.  See Lewis, 497
U.S. at 774, 110 S. Ct. at 3099.

A.   GRAVE RISK OF DEATH FACTOR

     Defendant argues that the first statutory aggravating factor

---

[20] The court's conclusion in Part IV that 18 U.S.C. § 924(j)(1)
and § 1512(a)(1)(C) are sufficiently narrow, in and of themselves,
to satisfy the constitutional narrowing requirement does not
foreclose this conclusion that aggravating factors in the FDPA are
intended to perform an additional narrowing function.  The FDPA
applies to numerous offenses for which a sentence of death is
authorized.  One of these offenses is the general federal murder
statute, 18 U.S.C. § 1111.  Although the statutes at issue in this
case perform substantial narrowing by their own terms, section 1111
encompasses essentially all murders that would give rise to federal
jurisdiction.  Section 1111 is the type of statute that would
almost certainly require additional narrowing in order to
legitimize a death sentence.  The FDPA was written to accommodate
broad and narrow statutes alike, and therefore had to be capable
of performing the necessary narrowing for statutes like section
1111, even though that narrowing might be redundant or unnecessary
under other statutes.

-39-

listed in the NOI must be dismissed as "duplicative and vague." (Doc. 145 at 43.)  The first aggravator reads as follows:

> The defendant, in the commission of the offense, knowingly created a grave risk of death to one or more persons in addition to the victim of the offense. (18 U.S.C. § 3592(c)(5)).

(Doc. 133 at 3.)  Defendant asserts that this aggravating factor is too vague "because there is no clear meaning given to the term 'grave risk' of death and the 'additional persons' is not identified." (Doc. 145 at 43.)

An aggravating factor "is not unconstitutional if it has some 'common-sense core of meaning ... that criminal juries should be capable of understanding." Tuilaepa v. California, 512 U.S. 967, 973, 114 S. Ct. 2630, 2636, 129 L. Ed. 2d 750 (1994) (quoting Jurek, 428 U.S. at 279, 96 S. Ct. at 2959).  Both the Tenth Circuit and the Supreme Court have concluded that a similar aggravating circumstance, that a defendant created a "great risk of death" to additional persons, is not void for vagueness.  See Proffitt, 428 U.S. at 256, 96 S. Ct. at 2968; Brecheen v. Reynolds, 41 F.3d 1343, 1360-61 (10th Cir. 1994).  Moreover, vagueness is evaluated not only in light of the words used to define the aggravator, but also based on the construction given that factor by the courts.  See Proffitt, 428 U.S. at 255, 256, 96 S. Ct. at 2968; Brecheen, 41 F.3d at 1361; see also Jones, 527 U.S. at 400-01, 119 S. Ct. at 2108 (holding that even counsels' closing arguments can cure vagueness problems in the wording of aggravating factors).  As applicable in the trial court, the construction of an aggravating factor is reflected largely by the jury instructions relating to

that factor.  Cf. United States v. Allen, 247 F.3d 741, 786 (8th Cir. 2001), vacated 536 U.S. 953, 122 S. Ct. 2653, 153 L. Ed. 2d 830 (2002) (remanding for reconsideration in light of Ring), and aff'd on reh'g 357 F.3d 745 (8th Cir. 2004) (en banc); United States v. Barnette, 211 F.3d 803, 819 (4th Cir. 2000). Accordingly, the court is confident based on Proffitt and Brecheen, that the parties and the court can craft jury instructions that will adequately define "grave risk" for the sentencer.  Accord Allen, 247 F.3d at 786; Barnette, 211 F.3d at 819; United States v. McVeigh, 944 F. Supp. 1478, 1490 (D. Colo. 1996).

With respect to defendant's argument that the government has failed to identify the additional persons who are the subject of this aggravating factor, the government provided this information in its response to another motion that makes similar arguments. (Docs. 140, 186.)  The government revealed that this factor is based on allegations that defendant fired two rounds from his .44 caliber handgun into the kitchen area of the residence while deputies were attempting to remove the wounded sheriff from the house.  The government asserts that two other people, Darrell and Belinda Cooper, were also in or near the vicinity of the kitchen when the shots were fired, and that the bullets' trajectories were sufficiently close to the Coopers to place them at risk of being hit.  (Doc. 186 at 3, 5-7, 11.)  The "grave risk of death" factor is focused on the danger posed to the Coopers.  Id.  Therefore, defendant's vagueness concerns have been addressed.

Although defendant asserts that this aggravating factor is also duplicative, he fails to provide any argument on this point.

(Doc. 145 at 43.)  However, the court notes that defendant raised a similar argument in a separate motion.  (Doc. 140.)  The court will not rule on the issue here, but will take it up in a separate order addressing Doc. 140.

B.  SUBSTANTIAL PLANNING AND PREMEDITATION FACTOR

Next, defendant attacks the government's second statutory aggravating factor as overbroad and vague.  (Doc. 143 at 43.)  That factors reads as follows:

> The defendant committed the offense following substantial planning and premeditation to cause the death of a person.  (18 U.S.C. § 3592(c)(9)).

(Doc. 133 at 3.)  Defendant takes a two-step approach in attacking this factor.  First, defendant argues that the word "substantial" is too vague to be comprehended and applied by a jury.  (Doc. 145 at 44.)  He then excises the word "substantial," and argues that the remaining phrase, "planning and premeditation" fails to perform the necessary narrowing function.  Id.  Therefore, defendant concludes, the entire factor must be dismissed.  Id.

Defendant's first argument is completely foreclosed by McCullah.[21]  In reviewing capital sentencing procedures under the Anti-Drug Abuse Act of 1988, 21 U.S.C. § 848, the Tenth Circuit concluded that an almost identically worded statutory aggravating factor was not unconstitutionally vague.  That factor read as follows: "The defendant committed the offense after substantial planning and premeditation."  21 U.S.C. § 848(n)(8).  That

_____

[21] While defendant notes the Tenth Circuit's decision in McCullah, his brief does not recognize it as controlling precedent. This suggests that much of his brief is boilerplate.

-42-

aggravator is, in all relevant respects, identical to the one at issue in this case. McCullah held that, "In the context in which it appears, the term ["substantial"] clearly has a commonsense meaning of 'considerable in quantity: significantly large,' which criminal juries are capable of understanding. See Webster's Ninth New Collegiate Dictionary 1176 (1991)." McCullah, 76 F.3d at 1110. The court having rejected this first step in defendant's analysis, the remainder of his argument regarding this aggravating factor collapses.

C.  MULTIPLE ATTEMPTED KILLINGS FACTOR

Finally, defendant takes a passing swipe at the third statutory aggravating factor alleged by the government: "The defendant attempted to kill other persons subsequent to the murder of Greenwood County Sheriff Matthew Samuels as part of a single criminal episode. (18 U.S.C. § 3592(c)(16))." (Doc. 133 at 3.) Once again, defendant claims this factor is unconstitutionally vague for failing to identify the "other persons." (Doc. 145 at 51.) As it did with the "grave risk of death" factor, the government provided this information in its response to a separate motion raising similar concerns. The government states that these other persons are sheriff's deputies and Kansas Highway Patrol Troopers identified or referenced in Counts One, Nine, Ten, and Eleven of the indictment. (Doc. 186 at 3 and n.1.) Defendant's motion is accordingly denied on this point.

Given that these statutory aggravating factors satisfy the constitutional standards raised by the defendant, it is clear from a review of the language used in the aggravators that they further

-43-

limit the scope of persons who may be rendered death-eligible under the FDPA.    All three of the charged aggravating factors impose additional, objective limitations on death eligibility by requiring the jury to unanimously find beyond a reasonable doubt some additional facts that would not be common to all murders.    In this regard, the statutory aggravating factors charged by the government perform additional narrowing to further _Furman_'s constitutional mandate of limiting the jury's discretion in determining who should live and who should die.

## VI. NON-STATUTORY AGGRAVATING FACTORS

In addition to the statutory aggravating factors just discussed, the NOI also included four non-statutory aggravating factors: 1) Victim Impact; 2) Future Dangerousness; 3) Murder of a Law Enforcement Officer; and, 4) Attempted Murder of Multiple Law Enforcement Officers.[22]    (Doc. 133 at 3-4.)    Defendant asks the court to dismiss all four of the factors.    (Doc. 145 at 51.) First, he argues that the entire process of allowing the government discretion to craft and charge non-statutory aggravating factors is unconstitutional for various reasons.[23]    Notably, however,

---

[22] The NOI included additional descriptions for each of these factors, the relevant parts of which the court will address as appropriate.

[23] In a separate section of his brief, defendant argued that the FDPA was unconstitutional because the methods adopted by the government in response to _Apprendi_ and _Ring_ violated the requirements for separation of powers and the non-delegation doctrine.    (Doc. 145 at 15-18.)    In that argument, defendant did not specifically address non-statutory aggravating factors. Nevertheless, to the extent that his brief might be interpreted as arguing that allowing prosecutors to select and charge non-statutory aggravators violates these aforementioned principles, his

defendant presents no authority on this point, other than general propositions from the Supreme Court that he attempts to apply to the FDPA. Id. at 51-56. Alternatively, he attacks the specific factors enumerated here on grounds of vagueness, failure to narrow, and other constitutional bases. Id. at 57-65.

A.  THE FDPA PROCESS ALLOWING PROSECUTORS TO CHARGE NON-STATUTORY AGGRAVATING FACTORS IS CONSTITUTIONAL

        First, it is important to note a significant distinction between statutory and non-statutory aggravating factors. Statutory aggravating factors serve a dual purpose in the FDPA: they are both eligibility factors and selection factors.   See 18 U.S.C. § 3593(e).   Statutory aggravating factors serve as eligibility factors in that the jury must find at least one statutory aggravator before it may even consider recommending the death penalty. 18 U.S.C. § 3593(e); see also Jones, 527 U.S. at 376-77, 119 S. Ct. at 2096.  In other words, defendant is not even rendered eligible for a death sentence under the FDPA until a unanimous jury has found beyond a reasonable doubt that he had the requisite intent, 18 U.S.C. § 3591(a)(2), and that at least one aggravating factor enumerated under section 3592(c) existed.  Jones, 527 U.S. at 376-77, 119 S. Ct. at 2096.  After that, statutory aggravating

_____

argument is foreclosed by Tenth Circuit precedent.
        In McCullah, the court of appeals specifically concluded that provisions of the Anti-Drug Abuse Act of 1988 that allowed prosecutors to craft and charge non-statutory aggravating factors were constitutional under separation of powers principles and the non-delegation doctrine. McCullah, 76 F.3d at 1106-07.  The court finds no material distinction between the authority granted the government to charge non-statutory aggravating factors under the Anti-Drug Abuse Act of 1988 and the FDPA.

factors serve as selection factors - that is, the jury is authorized to consider them, along with other specified information, in determining what sentence to recommend. See 18 U.S.C. § 3593(e); Jones, 527 U.S. at 377, 119 S. Ct. at 2097.

Unlike statutory aggravators, non-statutory aggravating factors under the FDPA are only selection factors. See 18 U.S.C. § 3593(e); see also Jones, 527 U.S. at 401, 119 S. Ct. at 2108 (plurality opinion); Allen, 247 F.3d at 757. They play no role in determining who is eligible for the death penalty. Allen, 247 F.3d at 757; United States v. Johnson, 362 F. Supp. 2d 1043, 1106 (N.D. Iowa 2005). Rather, the purpose of non-statutory aggravating factors is to help distinguish among death-eligible defendants in order to determine who, if anyone, should be executed. See Allen, 247 F.3d at 757; United States v. Karake, 370 F. Supp. 2d 275, 279 (D.D.C. 2005).

Defendant's first argument on this subject is that the non-statutory aggravating factors should be dismissed because they "do not constitutionally limit and guide the discretion of the jury, thus permitting wholly arbitrary and capricious death sentences." (Doc. 145 at 53.) However, the balance of his brief on this point does not address failure to limit or guide the jury. Instead, he complains that by authorizing prosecutors to define and charge unspecified, non-statutory aggravating factors, the FDPA imposes the same arbitrary, random procedural deficiencies condemned by Furman. Id. at 54.

The Supreme Court has distinguished between the role of

-46-

eligibility factors and selection factors. Eligibility factors "perform the constitutional narrowing function." <u>Brown v. Sanders</u>, __ U.S. __, 126 S.Ct. 884, 889 n.2 (2006); <u>see also</u> <u>Tuilaepa</u>, 512 U.S. at 971-72, 114 S. Ct. at 2634. Selection factors promote individualized sentencing. See <u>Tuilaepa</u>, 512 U.S. at 971-72, 114 S. Ct. at 2634; <u>McCullah</u>, 76 F.3d at 1106 ("At the selection stage of a capital proceeding, the focus is on 'an individualized determination on the basis of the character of the individual and the circumstances of the crime.' <u>Zant v. Stephens</u>, 462 U.S. 862, 879, 103 S. Ct. 2733, 2744, 77 L. Ed. 2d 235 (1983)"); <u>United States v. Regan</u>, 228 F. Supp. 2d 742, 749-50 (E.D. Va. 2002) ("[T]he intent of non-statutory factors is to individualize sentencing based upon the character of the individual and the circumstances of the case").

Generally speaking, once a capital defendant has been found eligible for the death penalty, <u>Furman</u>'s constitutional narrowing requirement has been met. See <u>Sanders</u>, 126 S. Ct. at 889, 894. At that point, "the sentencer may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.'" <u>Tuilaepa</u>, 512 U.S. at 979-80, 114 S. Ct. at 2639 (quoting <u>Zant</u>, 426 U.S. at 875, 103 S. Ct. at 2742). However, if the jury's discretion is channeled by a statutory scheme that directs it to consider particular selection factors, those factors must meet constitutional requirements for validity to "ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision."

<u>Tuilaepa</u>, 512 U.S. at 973, 114 S. Ct. at 2635; <u>see also</u> <u>Stringer</u>
<u>v. Black</u>, 503 U.S. 222, 235, 112 S. Ct. 1130, 1139, 117 L. Ed. 2d
367 (1992).   If the jury considers an invalid selection factor,
then there is a possibility that the weighing process will be
skewed by that invalid factor.   <u>See</u> <u>Sanders</u>, 126 S. Ct. at 891-92;
<u>Stringer</u>, 503 U.S. at 232, 112 S. Ct. at 1137.   Such skewing can
run afoul of the Eighth Amendment's requirements for individualized
sentencing .   <u>See</u> <u>Stringer</u>, 503 U.S. at 230, 112 S. Ct. at 1136.

     To the extent defendant's first argument really is that "non-
statutory aggravating factors do not constitutionally limit and
guide the discretion of the jury," (Doc. 145 at 53), it is
frivolous.    Who  can  say  whether  particular  non-statutory
aggravators will meet constitutional requirements for validity
until they have been drafted?   Defendant's argument appears to be
that all non-statutory aggravating factors fail in this regard, but
this defies logic.   It is certainly plausible that prosecutors
might draft extremely well-defined non-statutory aggravators that
would do a satisfactory job of limiting and guiding the jury's
discretion.   Hence, non-statutory aggravating factors must be
evaluated individually, not in the wholesale fashion that defendant
urges here.

     More   likely,   defendant's   intent   is   to   attack   the
constitutionality of the procedure that allows prosecutors to draft
non-statutory aggravating factors.   In particular, he argues that
allowing  prosecutors  to  "unilaterally  expand  the  list  of
aggravating factors on a case-by-case basis would inject into
capital proceedings precisely the uncertainty and disparate case

results that <u>Furman</u> found to violate the Eighth Amendment." (Doc. 145 at 54.) However, <u>Furman</u> was concerned with the unfettered discretion given to capital juries to impose death following conviction under broadly defined offenses. <u>See</u> <u>Gregg</u>, 428 U.S. at 195 n.47, 206, 96 S. Ct. at 2936, 2940-41 (Stewart, Powell, and Stevens, JJ., concurring); <u>id.</u> at 220-21, 96 S. Ct. at 2947 (Burger, C.J., and White and Rehnquist, JJ., concurring). <u>Tuilaepa</u> teaches that, once death eligibility requirements have been satisfied by convicting a capital defendant of murder and finding at least one aggravating circumstance, the same "unbridled discretion" that was found taboo in <u>Furman</u> becomes completely appropriate under the Eighth Amendment. <u>Tuilaepa</u>, 512 U.S. at 971-72, 979, 114 S. Ct. at 2634, 2639. Thus, at the selection phase of an FDPA proceeding, the risks of "uncertainty and disparate case results" that would offend the Constitution have already been substantially eliminated. (Doc. 145 at 54.)

Moreover, defendant's concern that prosecutors have unlimited authority to dream up and impose non-statutory aggravating factors is incorrect. Any such factors urged by the government must still pass constitutional muster. Recent cases at the district court level have helped synthesize the constitutional requirements for aggravating factors, both statutory and non-statutory, as expounded in numerous Supreme Court cases. In <u>United States v. Bin Laden</u>, 126 F. Supp. 2d 290 (S.D.N.Y. 2001), the court provided the following summary:

> First, the aggravator must not be so vague as
> to lack "some common-sense core meaning . . .
> that criminal juries [are] capable of

-49-

> understanding." (<u>Tuilaepa v. California</u>, 512
> U.S. 967, 972, 114 S. Ct. 2630, 129 L. Ed. 2d
> 750 (1994).)  Second, the aggravator cannot be
> overbroad such that a sentencing juror "fairly
> could conclude that [the] aggravating
> circumstance applies to every defendant
> eligible for the death penalty."[24] ( <u>Arave v.
> Creech</u>, 507 U.S. 463, 474, 113 S. Ct. 1534, 123
> L. Ed. 2d 188 (1993).)  Third, the aggravator
> must be "sufficiently relevant to the question
> of who should live and who should die." (<u>U.S.
> v. Davis</u>, 912 F. Supp. 938, 943 (E.D. La.
> 1996); <u>see</u> <u>Arave</u>, 507 U.S. at 474, 113 S. Ct.
> 1534; <u>U.S. v. Cuff</u>, 38 F. Supp. 2d 282, 288-289
> (S.D.N.Y. 1999) ("A predicate to fulfilling the
> constitutional conditions for an aggravating
> factor is that the disputed factor be an
> aggravating factor in the first place."); <u>U.S.
> v. Friend</u>, 92 F. Supp. 2d 534, 541 (E.D. Va.
> 2000).)  Fourth, even if relevant, the
> aggravator may be excluded "if its probative
> value is outweighed by the danger of creating
> unfair prejudice, confusing the issues, or
> misleading the jury." (18 U.S.C. § 3593(c); <u>see
> also</u> <u>Friend</u>, 92 F. Supp. 2d at 541 (deeming it
> "essential that an aggravating factor be
> measured in perspective of the fundamental
> requirement of heightened reliability").)

<u>Id.</u> at 298.  <u>McCullah</u> also imposes the additional requirement that aggravating factors cannot be duplicative of one another.  76 F.3d at 1111-12.  Reduced to a list then, non-statutory aggravating factors must be both relevant and reliable, while they may not be vague, duplicative, or perhaps, overbroad.  If the government charges non-statutory aggravating factors that violate these requirements, the court can strike them from the NOI.  This process

---

[24] <u>But see</u> <u>Jones</u>, 527 U.S. at 401, 119 S. Ct. at 2108 (plurality opinion) (noting that the Court had never considered what it meant for a selection factor, rather than an eligibility factor, to be overbroad).  Since the constitutional narrowing requirement is, by definition, satisfied at the eligibility phase, the question of what it means for a selection factor to be overbroad is a good one.

adequately protects defendant's rights.  His arguments to the contrary are rejected.

B.  USE OF NON-STATUTORY AGGRAVATING FACTORS DOES NOT VIOLATE THE BAN ON EX POST FACTO LAWS

Defendant's next general challenge to the FDPA's use of non-statutory aggravating factors is that this process violates the constitutional ban on ex post facto laws.[25]  (Doc. 145 at 55.)  To his credit, defendant acknowledges that this argument has been squarely rejected by the Eighth Circuit in Allen, as it should have been.  Id.  Indeed, one court after another has found defendant's argument meritless.  See, e.g., United States v. Higgs, 353 F.3d 281, 321-22 (4th Cir. 2003); Allen, 247 F.3d at 759; Regan, 228 F. Supp. 2d at 749; United States v. Llera Plaza, 179 F. Supp. 2d 444, 456 (E.D. Pa. 2001); McVeigh, 944 F. Supp. at 1486.

The Ex Post Facto Clause "is aimed at laws that retroactively alter the definition of crimes or increase the punishment for criminal acts." Cal. Dep't of Corr. v. Morales, 514 U.S. 499, 504-05, 115 S. Ct. 1597, 1601, 131 L. Ed. 2d 588 (1995).  Even after Ring, the FDPA's use of non-statutory aggravating factors does neither.  The operative language from Apprendi, on which Ring relied, is that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490, 120 S. Ct. at 2363 (emphasis added).  Thus, even accepting

---

[25] See U.S. Const. art. I, § 9, cl. 3 ("No . . . ex post facto Law shall be passed.").

for sake of argument defendant's conclusion that <u>Ring</u> created a new offense of federal capital murder (Doc. 145 at 13), the "elements" of such a crime would at most include one of the gateway intent factors and one statutory aggravating factor.  Once the jury makes those findings, a defendant is eligible for the death penalty, and the penalty that he faces cannot be increased any further.  Non-statutory aggravators do not even come into play until after the jury has found a defendant eligible for the death penalty.  They neither change the definition of the underlying crime, nor do they increase the potential punishment.  <u>See</u> <u>United States v. Purkey</u>, 428 F.3d 738, 749 (8th Cir. 2005) (en banc).  Therefore, the FDPA's use of non-statutory aggravating factors does not violate the Ex Post Facto Clause.

C.  THE LANGUAGE OF THE FDPA DOES NOT PRECLUDE THE USE OF NON-STATUTORY AGGRAVATING FACTORS

Defendant next argues that inconsistencies in the language of the FDPA preclude the use of non-statutory aggravating factors. He notes that under section 3591(a)(2), a defendant who has been found guilty of a capital offense with the requisite mental state "shall be sentenced to death if, <u>after consideration of the factors set forth in section 3592</u> . . . it is determined that imposition of a sentence of death is justified."  (Emphasis added). Defendant argues that non-statutory aggravating factors are not "set forth" in section 3592(c); therefore, such factors may not be considered by the jury in making a sentencing recommendation. (Doc. 145 at 55-56.)

In interpreting a statute, the court considers the legislative

-52-

scheme as a whole, and does not focus on individual provisions in isolation.  See TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S. Ct. 441, 449, 151 L. Ed. 2d 339 (2001).  Section 3592(c) authorizes the jury to consider "whether any other aggravating factor for which notice has been given exists."  The notice requirement is a reference to section 3593(a), which prescribes the use of the NOI to, among other things, identify the aggravating factors that the government intends to prove.  In elaborating on these aggravating factors, section 3593(a) expressly mentions victim impact evidence, including loss and suffering by the victim's family.  Since this aggravating factor is not expressly enumerated in section 3592(c), it is obvious that section 3593(a) contemplates the use of what is generally referred to as non-statutory aggravating factors. Continuing, section 3593(d) directs the jury to return special findings "identifying any aggravating factor or factors set forth in section 3592 found to exist and any other aggravating factor for which notice has been provided under subsection (a) found to exist."  This provision requires the jury to consider the existence of non-statutory aggravating factors identified in the NOI.

Read as a whole, these provisions clearly contemplate that the jury will consider any non-statutory aggravating factors identified in the NOI and for which the government presents evidence at the sentencing phase.  This court considered and rejected this precise argument in United States v. Nguyen:

> The court sees no merit in this argument.  A statute should be construed, if possible, in such a way that all of its provisions can be given effect, and so that no part of the statute is rendered inoperative or superfluous.

> Homeland Stores, Inc. v. Resolution Trust
> Corp., 17 F.3d 1269, 1273 (10th Cir.), cert.
> denied, 513 U.S. 928, 115 S. Ct. 317, 130 L.
> Ed. 2d 279 (1994). [Defendant's] strained and
> hyper-literal reading of § 3591(a) would render
> large portions of § 3592 inoperative. For
> example, if the court accepted [defendant's]
> construction of § 3591(a), then this would also
> render inoperative the "any other" mitigating
> factors provision, § 3592(a)(8), a result that
> [defendant] would surely claim violates the
> Fifth and Eighth Amendments. There is nothing
> internally contradictory or ambiguous about a
> statute referring to something "set forth" in
> a "catch-all provision." It is a frequently
> employed tool of the law.

928 F. Supp. 1525, 1536 (D. Kan. 1996); accord United States v. Robinson, 367 F.3d 278, 293 (5th Cir. 2004); Regan, 228 F. Supp. 2d 742, 749 (E.D. Va. 2002); Llera Plaza, 179 F. Supp. 2d 444, 457-59 (E.D. Pa. 2001). The court will not revisit the matter.[26]

D.   PROSECUTORIAL INCONSISTENCIES IN CHARGING NON-STATUTORY AGGRAVATING FACTORS

Finally, with respect to defendant's generalized attacks on the non-statutory aggravating factors, he requests a hearing where

------

[26] The court notes that Llera Plaza identified additional language in the FDPA that suggests a distinction between the phase employed in section 3591(a) and terminology used in other provisions, such as section 3593(d) (distinguishing between factors "set forth in section 3592" and "other aggravating factor[s] for which notice has been provided"). Llera Plaza, 179 F. Supp. 2d at 458-59. Nevertheless, Llera Plaza arrived at the same conclusion as the other courts that have rejected this argument. Id. at 459. Moreover, to the extent that Llera Plaza was right about the language in section 3591(a) being distinguishable from other references to aggravating factors in the FDPA, the court notes that the operative provision of section 3591(a) states that a defendant "shall be sentenced to death if [other conditions are met]." (Emphasis added). Under the FDPA, sentencing is the judge's function; the jury merely recommends a sentence. Compare 18 U.S.C. § 3593(e), with id. § 3594. Thus, it may be that section 3591(a) is addressed to the court, not the jury. Neither party has briefed this matter, and the court will not speculate on it when the matter has not been properly raised.

-54-

he hopes to prove that federal prosecutors across the nation have been inconsistent in alleging non-statutory aggravating factors. (Doc. 145 at 56.)  Defendant does not explain the type of evidence which he would offer at such a hearing, nor does he identify any case where a hearing was held.  Moreover, defendant fails to cite a single authority for the proposition that his theory makes any difference.  He asserts that this theoretical inconsistency makes the FDPA unconstitutionally arbitrary as applied.  Id.  However, the general condemnation of arbitrariness in capital proceedings has focused on the lack of standards to guide juries.  See Gregg, 428 U.S. at 189, 96 S. Ct. at 2932 (plurality opinion).  As already noted, the Supreme Court has set forth standards that circumscribe a prosecutor's discretion to allege non-statutory aggravators. Those standards include relevance and reliability, among others. The court will consider any arguments raised by defendant that the charged non-statutory aggravating factors fail to meet constitutional standards.  Under that scheme, defendant is protected against arbitrariness, without regard to what other prosecutors might be doing in other jurisdictions.  His argument and his request for a hearing on this matter are rejected.

E.  VICTIM IMPACT FACTOR

Turning now to defendant's specific attacks on the non-statutory aggravating factors alleged against him, he contends that the victim impact aggravator is unconstitutionally vague, and that it fails to narrow the class of murderers subject to the death penalty.  (Doc. 145 at 57-60.)  In the NOI, the government elaborates on this factor as follows:

> **Victim Impact.** The defendant's murder of
> Greenwood County Sheriff Matthew Samuels caused
> permanent harm to the family of Greenwood
> County Sheriff Matthew Samuels and to the
> people of Greenwood County, Kansas, because of
> the victim's personal characteristics as an
> individual human being and the impact of his
> death upon those persons.

(Doc. 133 at 3 (emphasis in original).)  The government has further

revealed its intentions in this area in a response to a related

motion addressing non-statutory aggravating factors.  (Doc. 187.)

In that response, the government states that it will call family

members to testify regarding how the loss of the sheriff has

affected their lives.  Id. at 6.  Prosecutors also intend to call

other officers of the Greenwood County Sheriff's Department to

testify about the impact Sheriff Samuels' death had on the

department and on the people of Greenwood County.  Id. at 8.

Finally, the government intends to present evidence on Sheriff

Samuels' involvement in civic and community activities.  Id.

The Eighth Amendment does not bar admission of victim impact

evidence at the penalty phase of a capital trial.  United States

v. Chanthadara, 230 F.3d 1237, 1273 (10th Cir. 2000) (citing Payne

v. Tennessee, 501 U.S. 808, 819-27, 111 S. Ct. 2597, 115 L. Ed. 2d

720 (1991)).  The FDPA specifically authorizes its admission if

notice has been given.  18 U.S.C. § 3593.  With respect to

defendant's argument that this factor fails to narrow the field of

death-eligible murderers, the Tenth Circuit has provided this clear

guidance:

> [Defendant] specifically contends that, because
> all murders have victims, and all victims have
> families, a victim impact aggravating factor
> does not narrow the class of offenses for which

-56-

the death penalty may be imposed, as required under the Eighth Amendment. <u>This argument is foreclosed by binding case law</u>. The Supreme Court has recently stated: "The Eighth Amendment . . . permits capital sentencing juries to consider evidence relating to the victim's personal characteristics and the emotional impact of the murder on the victim's family in deciding whether an eligible defendant should receive a death sentence." <u>Jones</u>, 527 U.S. at 395, 119 S. Ct. 2090. In concluding the victim impact aggravating factor at issue was not unconstitutionally overbroad, the Court explained:

> Of course, every murder will have an impact on the victim's family and friends·. . . Even though the concept[ ] of victim impact . . . may well be relevant in every case, evidence of . . . victim impact in a particular case is inherently individualized. . . . So long as . . . victim impact factors are used to direct the jury to the individual circumstances of the case, we do not think [the] principle [against bias or caprice in the sentencing decision] will be disturbed. <u>Id.</u> at 401, 119 S. Ct. 2090.

<u>Chanthadara</u>, 230 F.3d at 1273 (emphasis added). Indeed, as already discussed, the constitutional narrowing function is completed at the eligibility phase of an FDPA proceeding. <u>See</u> <u>Sanders</u>, 126 S. Ct. at 889, 894. Moreover, it is arguable that a more generally phrased aggravator is desirable at the selection phase because it directs the jury to consider evidence and draw its own conclusions, rather than suggesting an answer - the former method being more neutral, and one apparently favored by the Supreme Court. <u>See</u> Tuilaepa, 512 U.S. at 974-75, 978, 114 S. Ct. at 2636, 2638.

Nevertheless, the factor cannot be phrased in such general terms as to be unconstitutionally vague. "[A] factor is not unconstitutional if it has some 'common-sense core of meaning . .

-57-

. that criminal juries should be capable of understanding'." Tuilaepa, 512 U.S. at 973-74, 114 S. Ct. at 2636 (quoting Jurek, 428 U.S. at 279, 96 S. Ct. at 2959 (White, J., concurring in judgment)). However, courts are to be "quite deferential" in their review of factors for vagueness. Id. at 973.

Looking to all the information provided by the government, the court has only one area of concern regarding vagueness. See Jones, 527 U.S. at 401, 119 S. Ct. at 2108 (plurality opinion) (resolving vagueness inquiry by looking not only to the factor as worded, but also to the government's argument to the jury). That area involves the notion of the harm suffered by the people of Greenwood County. Even the court is at a loss as to the evidence which might be contemplated under that portion of the victim impact factor. Accordingly, the government will be ordered to provide defendant with sufficient detail on this factor so that he will know what is intended and can raise any appropriate objections. See United States v. Glover, 43 F. Supp. 2d 1217, 1225 (D. Kan. 1999). However, the court notes that defendant has a separate motion on file challenging other aspects related to the victim impact aggravator. (Doc. 141.) The court has already reviewed that motion and has concluded that additional disclosure will be required for issues raised therein. In order to avoid the potential confusion associated with issuing multiple orders requiring additional disclosure on the same aggravating factor, the court will give specific instructions and deadlines for all disclosures related to the victim impact aggravating factor in its forthcoming order disposing of Doc. 141.

F.   FUTURE DANGEROUSNESS FACTOR

     Next, defendant contests the validity of another non-statutory
aggravating factor alleged against him - future dangerousness.
(Doc. 145 at 61.)   In the NOI, the government charged this factor
as follows:

> **Future Dangerousness.** The defendant represents
> a continuing danger to the lives and safety of
> others in the future as is evidenced by the
> following:
>
> A)   The defendant has a lack of remorse
>      for the murder of Greenwood County
>      Sheriff Matthew Samuels;
> B)   His past criminal conduct;
> C)   The severity of the instant crimes;
> D)   The defendant was in custody of the
>      Kansas Department of Corrections in
>      parole status at the time these
>      offenses were committed;
> E)   The defendant was a parole absconder
>      at the time these offenses were
>      committed;
> F)   The defendant's threats to others;
> G)   His stated desire to escape from
>      prison;
> H)   His lack of desire and/or failure to
>      comply with prison/jail/detention
>      facility rules and regulations;
> I)   His stated desire to commit a bank
>      robbery;
> J)   His manufacture and use of illegal
>      drugs.

(Doc. 133 at 3-4 (emphasis in original).)   In addition to the
considerable detail provided in the NOI, the government
supplemented its disclosures on this matter in its response to a
separate motion addressing this same aggravator. (Doc. 188.)  With
respect to the claim of lack of remorse, the government revealed
the contents of letters written by defendant while in custody, in
which he boasts about his actions in killing Sheriff Samuels, and
claims that he would do it again.   Id. at 11-13.   As evidence of

defendant's past criminal conduct, prosecutors claim that he has previously been convicted of attempted aggravated robbery of a store, in which he severely beat a victim.  Id. at 13.  Defendant is also alleged to have a juvenile adjudication for severely beating a classmate in high school.  Id.  As for the severity of the crime, the government disclosed that it intends to focus on defendant's conduct in shooting at other deputies while they pleaded with him to let them drag the dying sheriff out of the house.  Id. at 16.

In addition to these facts, the government claims that defendant made a number of threats to other people while in custody pending this trial.  The government disclosed the contents of a letter in which defendant made threats against a former co-defendant, whom he believed had informed on defendant.  Id. at 17. The language used in that threat is arguably a threat to kill the targeted victim.  In another letter, defendant threatened to attack and kill some of his jail guards, and to take hostages in an effort to escape.  Id. at 18.  He also stated his feeling that he may need to kill a guard "just to get some respect."  Id.  As evidence that defendant's threats were not necessarily hollow, the government plans to show that, after a former associate, Nathan Fife, began to cooperate with police, defendant escaped from his isolation cell, managed to sneak into a different part of the jail where Fife was housed, and was finally apprehended directly outside the door to Fife's cell.  All this occurred after defendant sent Fife a threatening note indicating that defendant was aware of Fife's efforts to cooperate with authorities.  Id. at 18-19.

Finally, the government offers evidence to show that, while in custody awaiting trial, defendant assaulted a detention officer. Id. at 19-20.

Turning to the remaining specific allegations of future dangerousness, the government points to a great deal of the previously mentioned jailhouse conduct as evidence that defendant refuses to comply with jail and prison rules. As further evidence of this propensity, while in jail, defendant was caught with a weapon made from a toothbrush. Id. at 20. The government also puts forth evidence that defendant has stated his desire to rob a bank. Not only did he document that desire before his arrest, but he has reaffirmed it in some of his jailhouse letters, indicating that he must escape in order to fulfill this compelling desire to commit a bank robbery before he dies. Id. at 21. Finally, in support of the claim that the manufacture and use of illegal drugs relates to future dangerousness, the government claims defendant told his mother that he had learned numerous different ways to manufacture methamphetamine during a previous prison term. Id. at 21.

Subsequent to filing the aforementioned response, the government filed a supplemental response that chronicled even more evidence pertaining to the claim of future dangerousness. (Doc. 231.) Therein, prosecutors disclosed another letter written by defendant while incarcerated pending trial, in which he threatens to harm, or possibly kill, some unknown person whom he believes is seeing his former girlfriend. Id. at 2. The government also provides more detail regarding the incident in which defendant

escaped from his cell to seek out Nathan Fife. Id. In another letter, defendant reaffirms his commitment to escape from prison. Id. at 3.[27]

Defendant's first argument is that the NOI failed to provide sufficient notice of the facts or theories upon which the government intended to rely in order to prove the future dangerousness aggravator. (Doc. 145 at 61-62.) More specifically, defendant claims that "to comply with the requirements of due process, [the government] must at least allege some concrete facts with dates and times - or provide a minimal outline of its theory - so that the defense may not the nature of the claim." Id. at 62. There can be little doubt that the subsequent disclosures by the government have far exceeded defendant's request. (Docs. 188, 231.) The court does not here rule on the arguments presented in defendant's separate motion regarding this factor (Doc. 142), to which these responses were specifically aimed. Rather, the court merely finds that the details conveyed in those responses are sufficient to allay the concerns raised by defendant in the present motion. (Doc. 145.)

Proceeding without authority once again, defendant next argues that future dangerousness is not a valid non-statutory aggravating factor under the FDPA because Congress could have included it in the list of statutory aggravating factors, but chose not to do so. (Doc. 145 at 62.) He supports this claim by arguing that Congress

---

[27] The government also discloses additional letters by defendant; however, it is unclear from the content of those letters exactly how they bear on the issues charged under the future dangerousness aggravator. Id. at 4.

did choose to include several statutory aggravating factors that bear on a defendant's future dangerousness.  Id.  Continuing, he argues that since Congress chose those aspects of a defendant's conduct that it wanted juries to consider with respect to future dangerousness, it necessarily follows that Congress did not intend for prosecutors to bring in other aspects of a defendant's future dangerousness by alleging such dangerousness as a non-statutory aggravating factor.  Id. at 62-63.

It is well-settled that the Constitution permits the consideration of evidence relating to future dangerousness at the penalty phase of a capital trial.  Tuilaepa, 512 U.S. at 976-77, 114 S. Ct. at 2637; Jurek, 428 U.S. at 274-76, 96 S. Ct. at 2957-58; Tillman v. Cook, 215 F.3d 1116, 1130 (10th Cir. 2000).  Although Congress may have specified some statutory aggravating factors that may relate to future dangerousness, it also clearly delegated to the government broad discretion to allege non-statutory aggravators.  Defendant points to no authority for his proposition.  By contrast, the lower courts considering this or similar arguments have uniformly held that future dangerousness may be a permissible non-statutory aggravating factor under the FDPA. See, e.g., United States v. Rodriguez, 2006 WL 487117, *5 (D.N.D. Feb. 28, 2006); Bin Laden, 126 F. Supp. 2d at 303-04; United States v. Cooper, 91 F. Supp. 2d 90, 111-12 (D.D.C. 2000); Glover, 43 F. Supp. 2d at 1227; United States v. Frank, 8 F. Supp. 2d 253, 279 (S.D.N.Y. 1998); United States v. Spivey, 958 F. Supp. 1523, 1534-35 (D.N.M. 1997).  The court will not part company with these other courts based on nothing but unsubstantiated speculation as

-63-

to what Congress might have intended by its silence on this matter.

G.   OTHER NON-STATUTORY AGGRAVATING FACTORS

     For his last two arguments attacking non-statutory aggravating factors, defendant basically reiterates his logic that, if Congress did not include these factors as statutory aggravators, this evinces congressional intent to preclude the government from alleging them as non-statutory aggravating factors. (Doc. 145 at 64-65.)   The two factors at issue are described in the NOI as "Murder of a Law Enforcement Officer" and "Attempted Murder of Multiple Law Enforcement Officers." (Doc. 133 at 4.)   Defendant's argument on this point is rejected for the same reason that his similar argument as to future dangerousness was rejected.  Congress granted prosecutors broad discretion to allege non-statutory aggravating factors.  That authority has been uniformly upheld so long as the factors meet constitutional standards for vagueness, relevance, reliability, etc.   The court will not construe congressional silence on this matter as an affirmative bar to the factors at issue here.  Defendant presents no authority for his argument, not even some snippets from legislative history.  His motion on these points is accordingly denied.

**VII.  CONSTITUTIONALITY OF THE FDPA IN LIGHT OF JURORS' PERFORMANCE**

     The court now turns to the arguments presented in defendant's second motion to declare the death penalty unconstitutional. (Doc. 146.)   In this lengthy brief, which has every appearance of the "boiler-plate" variety, defendant argues that extensive sociological studies have concluded that capital juries routinely base their decisions on improper factors and reach conclusions at

-64-

inappropriate stages of the trial.  Reduced to their essence, the
conclusions from these studies, on which defendant relies, is that
the American public is either too stupid or too dishonest to field
a jury pool that will carry out its constitutional duties in a
capital case.  (Doc. 146 at 58-61.)  The argument that capital
juries lack the intelligence to do their job is based on findings
that the instructions necessary to walk a capital jury through the
guilt and penalty phases of a death penalty case are too complex
for many jurors to understand.  Id. at 47-50, 54-55.  The
alternative argument that the jurors disregard the instructions is
based on empirical data from prior jurors who allegedly admitted
that they based their decision on improper factors or made their
decisions before hearing all the evidence.  Id. at 40-44, 50-53,
56-57.  Disregarding the instructions is a violation of the oath
administered to jurors when they are sworn, and it is on this basis
that the court summarizes and paraphrases defendant's argument to
be that the jurors are simply dishonest when, in voir dire, they
state that they can and will follow the courts instructions, and
then willfully refuse to follow those instructions and be bound by
their oath.

The jury system is a somewhat unique institution among
civilized societies.  Although other constitutional rights have
been extended to American territorial possessions, the Supreme
Court has been quite circumspect about recognizing a right to jury
trial in territories that do not share our history of trial by
jury.  See, e.g., Dorr v. United States, 195 U.S. 138, 145, 148,
24 S. Ct. 808, 811, 812, 49 L. Ed. 128 (1904) (right to jury trial

did not extend to Philippine Territory where civilized areas were accustomed to non-jury trials under Spanish rule, and "uncivilized" areas inhabited by "savage" people were unfit to exercise the right). In <u>Balzac v. Porto Rico</u>, 258 U.S. 298, 42 S. Ct. 343, 66 L. Ed. 627 (1922), the court summarized this hesitation as follows:

> "[I]f the United States shall acquire by treaty the cession of territory having an established system of jurisprudence, where jury trials are unknown, but a method of fair and orderly trial prevails under an acceptable and long-established code, the preference of the people must be disregarded, their established customs ignored, and they themselves coerced to accept, in advance of incorporation into the United States, a system of trial unknown to them and unsuited to their needs. We do not think it was intended, in giving power to Congress to make regulations for the territories, to hamper its exercise with this condition."
>
> The jury system needs citizens trained to the exercise of the reponsibilities [sic] of jurors. In common-law countries centuries of tradition have prepared a conception of the impartial attitude jurors must assume. The jury system postulates a conscious duty of participation in the machinery of justice which it is hard for people not brought up in fundamentally popular government at once to acquire. One of its greatest benefits is in the security it gives the people that they, as jurors, actual or possible, being part of the judicial system of the country, can prevent its arbitrary use or abuse. Congress has thought that a people like the Filipinos, or the Porto Ricans, trained to a complete judicial system which knows no juries, living in compact and ancient communities, with definitely formed customs and political conceptions, should be permitted themselves to determine how far they wish to adopt this institution of Anglo-Saxon origin, and when.

<u>Id.</u> at 310, 42 S. Ct. at 347 (quoting <u>Dorr</u>, 195 U. S. at 148, 24 S. Ct. at 812).

Defendant asks the court to find that, like the people of the

Phillippines in 1904 and Puerto Rico in 1922, the American people are not up to the task of discharging their duties under a jury system. Indeed, unlike the Phillippines and Puerto Rico, where the Court concluded that the citizens were simply unprepared to have a jury system imposed on them as a condition of becoming a U.S. territory, defendant would have the court conclude that the American people, once a shining example of the jury system at its finest, have now degenerated, intellectually and/or morally, to the point that they can no longer be entrusted with the responsibilities of jurors - at least in capital proceedings. Frankly, the court lacks the arrogance required to render such a sweeping condemnation of the American public.

Moreover, even if the court were to entertain defendant's disturbing arguments, he would not be entitled to relief. Generally speaking, the Supreme Court has granted relief in capital cases in two situations: 1) when the sentencing scheme is constitutionally deficient; and 2) when the proceedings under review had a specific constitutional flaw. <u>Furman</u> is the quintessential example of the first situation. In that case, the Court found that the capital sentencing procedures under review were facially unconstitutional because they allowed capital juries to impose the death penalty in an arbitrary and capricious manner. <u>Woodson</u> and <u>Stanislaus Roberts</u> are likewise examples of this first situation, where the Court struck down North Carolina and Louisiana laws that made a death sentence mandatory for certain crimes. While these types of cases often involve facial challenges to a statute, they can involve as-applied challenges when the

-67-

application is generic, rather than case-specific.  One example of this type of case is Godfrey v. Georgia, where the Supreme Court invalidated a Georgia statutory aggravating factor based not only on the language of the aggravator, but also on the construction given that language by the Georgia Supreme Court.  By contrast, the second basis for overturning death sentences deals not with the constitutionality of the sentencing scheme, but rather with deviations from that scheme or other case-specific errors. Examples of this type of situation include Rompilla v. Beard, __ U.S. __, 125 S. Ct. 2456, 2469, 162 L. Ed. 2d 360 (2005), where the court overturned a death sentence based on ineffective assistance of counsel, and Miller-El v. Dretke, __ U.S. __, 125 S. Ct. 2317, 2340, 162 L. Ed. 2d 196 (2005), where the Court granted habeas relief based on Batson issues during jury selection.

Since this case has not been tried, the second situation, that defendant's constitutional rights were specifically violated in this proceeding, is not ripe.  That leaves only the first option - that the FDPA sentencing procedures are constitutionally flawed - as a basis to grant defendant's request and declare the death penalty unconstitutional.

However, there is a distinction between a scheme that is facially flawed, and one that is arguably broken because the jurors cannot or will not follow the procedure.  The court has already ruled that the FDPA is constitutional on its face.  Here, defendant argues that the real deficiency in the FDPA, and all death penalty schemes, is that the jurors are not up to the task.  In McCleskey v. Kemp, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987),

-68-

the Supreme Court took up a similar claim that Georgia jurors were imposing the death penalty in a racially discriminatory manner. In support of this claim, the defendant proffered a study purporting to show that black defendants were statistically far more likely to be condemned to death by a Georgia jury than similarly situated white defendants, particularly when the victim was white.  <u>Id.</u> at 286-87, 107 S. Ct. at 1764.

The Court rejected that claim, specifically noting that it had already approved Georgia's capital sentencing scheme in <u>Gregg</u>.  <u>Id.</u> at 308, 107 S. Ct. at 1775.  In further rejecting the defendant's claim that, despite the fact that the Georgia system was constitutional on its face, it was generally applied in an unconstitutional manner, the Court said,

> <u>McCleskey's arguments are best presented to the legislative bodies</u>.  It is not the responsibility – or indeed even the right – of this Court to determine the appropriate punishment for particular crimes.  It is the legislatures, the elected representatives of the people, that are "constituted to respond to the will and consequently the moral values of the people."  <u>Furman v. Georgia</u>, 408 U.S., at 383, 92 S. Ct., at 2800 (Burger, C.J., dissenting).  <u>Legislatures also are better qualified to weigh and "evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts</u>," <u>Gregg v. Georgia</u>, <u>supra</u>, 428 U.S., at 186, 96 S.Ct., at 2931.  Capital punishment is now the law in more than two-thirds of our States.  <u>It is the ultimate duty of courts to determine on a case-by-case basis whether these laws are applied consistently with the Constitution</u>.  Despite McCleskey's wide-ranging arguments that basically challenge the validity of capital punishment in our multiracial society, <u>the only question before us is whether in his case</u>, <u>see</u> <u>supra</u>, at 1761-1762, the law of Georgia was properly applied.

-69-

Id. at 319, 107 S. Ct. at 1781-82 (emphasis added).  Just as in McCleskey, defendant asks the court to find the FDPA unconstitutional, not because of deficiencies in the statute, but because of theoretical flaws in the way jurors might conduct themselves in his case.  The Supreme Court declined that invitation, and this court follows that lead.

The underlined language from McCleskey yields two important, common-sense principles that guide the court's decision here. First, the types of social science studies on which defendant relies are best presented to legislators, not courts.  Indeed, what is the evidentiary value of these studies?  Defendant has not proffered the studies, themselves; nor has he proffered an expert who will rely on them to yield opinions with genuine evidentiary value.  Cf. id. at 288 n.6, 107 S. Ct. at 1765 (noting that the district court had conducted an evidentiary hearing in which the author of the relevant study testified).  Instead, defendant has offered hand-picked sound bytes from unidentified jurors, without the benefit of the background context in which the jurors' hearsay statements can be evaluated.  This is not evidence.  Rather, it is the sort of anecdotal data best suited to sway politicians, not judges.

The other relevant principle from McCleskey is that the court needs to focus on the possible existence of constitutional flaws in this case.  Defendant has put forth no evidence that the jurors likely to serve on his jury are incapable or unwilling to follow instructions.  See id. at 294-95, 107 S. Ct. at 1768 (noting the difficulty of applying defendant's statistical studies to any

<u>particular case</u>); <u>id.</u> at 297, 107 S. Ct. at 1770 (rejecting defendant's claim <u>because</u> his study failed to provide any evidence of discrimination <u>in his case</u>). The bottom line is that one can find jury "experts" who will say anything they are paid to say and juror studies which are skewed to state a conclusion which reflects the point of view of the author. Defendant asks the court to put capital punishment on trial in what could only be expected to devolve into a sideshow battle of "experts." It is not this court's task to put capital punishment on trial. That's a job for someone else. This court's job is to ensure a fair trial for <u>this</u> defendant for the crimes charged in the indictment.

Alternatively, even if the court considered defendant's studies, the finding that he advocates could not be rendered on the shabby record presented. <u>See id.</u> at 297, 107 S. Ct. at 1770 (rejecting defendant's statistical study and stating, "Because discretion is essential to the criminal justice process, <u>we would demand exceptionally clear proof</u> before we would infer that the discretion has been abused." (Emphasis added)). First, he asks the court to declare the death penalty, as particularly administered in California, unconstitutional. (Doc. 146 at 61.) Well, this is not California; this is Kansas. Furthermore, this is not a case arising under some state death penalty scheme. Instead, it is a capital proceeding arising under the Federal Death Penalty Act. Defendant points to no studies analyzing jurors' ability to apply the FDPA.

Defendant's arguments that a death-qualified jury is biased

toward conviction have already been rejected by the Supreme Court. See generally Lockhart v. McCree, 476 U.S. 162, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986).  To the extent defendant claims that his new social science studies are a response to McCree, and that the court ought to consider these studies in ruling on his claim that death-qualified juries are unconstitutionally biased, as well as his other claims about jurors' inability or willful refusal to follow the law, the court finds that the information presented in his brief is inadequate to merit the relief requested.  According to defendant, these studies focus on capital jurors from only 14 states.  (Doc. 146 at 39.)  There is no suggestion that any of these former jurors were from Kansas, which raises considerable doubts as to whether the conclusions of these studies have any bearing on the jury pool in the present case.  See McCleskey, 481 U.S. at 297, 107 S. Ct. at 1770.  Moreover, the anecdotal "evidence" offered in defendant's brief amounts to a sampling of comments hand-picked to support defendant's argument.  The details as to how the studies were conducted are omitted from the brief, leaving the court with the uneasy feeling that either defendant or the authors of these reports have cherry-picked the data to support their position.

As an example of the problems inherent in these studies, the court looks to defendant's evidence regarding the inability of capital jurors in North Carolina to understand and apply instructions.  (Doc. 146 at 47-50.)  A review of the underlying study leaves unanswered many critical questions.  See generally James Luginbuhl & Julie Howe, Discretion in Capital Sentencing

-72-

Instructions: Guided or Misguided?, 70 Ind. L.J. 1161 (1995).  For instance, defendant points to no evidence in the report as to how much time elapsed between the trial and the interviews with the former jurors.  Since defendant is basically asking the court to take judicial notice of these outside studies, the court also notices its own experience in handling cases.[28]  It does not take long from the time the court completes work on an order or a trial that the details of that case start to become fuzzy.  Likewise, jurors' recollection of the details and intricacies of jury instructions can also be assumed to fade over time.  By failing to report the amount of time that elapsed between the trial and the interview, the accuracy of the study's conclusions are difficult to assess.

Similarly, the study fails to mention whether the interviewed jurors had the penalty phase instructions in front of them during the interview.  Indeed, the study does not even mention whether the jurors had the instructions with them in the jury room.  In this case, each juror will be given a set of written instructions that will be available during deliberations.  The court notes that, in

---

[28] The court also takes notice of two FDPA cases over which this court personally presided - United States v. Chanthadara, No. 94-10128-01 and United States v. Nguyen, No 94-10129-1.  The details of those cases are reported in United States v. Chanthadara, 230 F.3d 1237 (10th Cir. 2000) and United States v. Nguyen, 155 F.3d 1219 (10th Cir. 1998).  Those two cases arose out of the same incident - the armed robbery of an oriental restaurant in which the owner's wife was brutally beaten with a pool cue and then shot to death.  The juries in those two case were selected from the same pool, given the same instructions, and presented with essentially the same evidence.  Chanthadara's jury recommended the death penalty, and Nguyen's jury recommended a life sentence without parole.  Those are real world examples of how Kansas juries perform in an FDPA case.

order to properly apply the instructions in an FDPA case, the jurors will almost certainly need to refer to those instructions during the course of deliberations. If the study's interviews were conducted without the relevant jury instructions, it would be no wonder that many former jurors would be incapable of properly explaining the law relating to their sentencing decision. Most lawyers could not do that without considerable preparation.

In sum, even if the court were to consider the social science studies advanced by defendant, it would follow the lead of other courts that have categorically rejected the application of these studies to FDPA proceedings. See Regan, 228 F. Supp. 2d at 746-47; Llera Plaza, 179 F. Supp. 2d at 450 n.5; United States v. Mikos, 2003 WL 22110948, *18 (N.D. Ill. Sept. 11, 2003); United States v. Kee, 2000 WL 863119, *3 (S.D.N.Y. June 27,2000); see also Free v. Peters, 12 F.3d 700, 705-06 (7th Cir. 1993) (rejecting similar studies based on fallacies in the study's methods and crucial questions that the study left unanswered). At most, defendant's studies might be interpreted as suggesting the existence of some risk that capital jurors make their sentencing decisions prematurely or based on inappropriate factors. However, when faced with similar studies indicating the risk of racial prejudice influencing the decisions of Georgia's capital jurors, the Supreme Court said, "The question 'is at what point that risk becomes constitutionally unacceptable.'" McCleskey, 481 U.S. at 308-09, 107 S. Ct. at 1776 (quoting Turner v. Murray, 476 U.S. 28, 36, n. 8, 106 S.Ct. 1683, 1688, n. 8, 90 L.Ed.2d 27 (1986)). Defendant's studies, at least to the extent he has directed the court to their

content, provide little insight into the risks that Kansas jurors cannot or will not follow the FDPA procedures in this case.  His arguments to the contrary are accordingly rejected.

## VIII.   CONCLUSION

Defendant's motions are denied, except that the government will be required to provide additional disclosure on the subject of what it intends to prove regarding the impact of Sheriff Samuels' death on the people of Greenwood County.  More direction regarding that disclosure requirement will be provided in a forthcoming order addressing the victim impact aggravating factor. The government need not take any action regarding this disclosure until that order is issued.

IT IS SO ORDERED.

Dated this   29th   day of March 2006, at Wichita, Kansas.


s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE