## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )      **CRIMINAL ACTION**
                               )
v.                             )      No.  05-10050-01-MLB
                               )
SCOTT D. CHEEVER,              )
                               )
                Defendant.     )
_____)

## MEMORANDUM AND ORDER

This case comes before the court on defendant's motion to strike the future dangerousness non-statutory aggravating factor from the government's Notice of Intent to Seek the Death Penalty (NOI) (Doc. 133).[1]  (Doc. 142.)  In the alternative, defendant asks the court to strike from the NOI certain subparagraphs related to the future dangerousness aggravator and order the government to provide more disclosure regarding the remaining aspects of this aggravating factor. Id. at 11.   The government filed a response and a supplemental response.  (Docs. 188, 231).  No reply has been filed.  Defendant's motion is GRANTED in part, DENIED in part, and otherwise taken under advisement for reasons set forth herein.

## I.  INTRODUCTION

Defendant is charged in a thirteen-count third superseding indictment with crimes arising out of an altercation with law enforcement on or about January 19, 2005.  (Doc. 200.)  The government

_____

[1] Pursuant to a previous order, the government amended the NOI on March 31, 2006.  (Doc. 250.)  All references will be to the amended NOI unless specifically noted.

claims that defendant and a number of former co-defendants were manufacturing methamphetamine at a rural home in Greenwood County, Kansas.  Responding to a tip that defendant was at this residence, Greenwood County Sheriff Matthew Samuels and two deputies went to the house to investigate.  Sheriff Samuels entered the house.  Shortly thereafter, the government alleges that defendant shot the sheriff twice with a .44 magnum revolver at close range.  Sheriff Samuels died as a result of those wounds.  (Doc. 200.)

Among other offenses, Count Five of the indictment charges defendant with murder through the use of a firearm during the commission of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1), (j)(1).  Count Six charges defendant with murder to prevent a witness from communicating to federal officials information relating to the commission of federal crimes, in violation of 18 U.S.C. § 1512(a)(1)(C).  The government's theory on Count Six is that defendant killed Sheriff Samuels to prevent him from informing federal officials that defendant was a felon in possession of firearms, that he knowingly possessed stolen firearms, and that defendant may have been involved in a bank robbery.  (Doc. 200 at 6.)  The crimes charged in Counts Five and Six each carry a sentence of death or life imprisonment.  Count Five, however, also allows for a sentence of imprisonment for any term of years.  The fact finder, presumably a jury in this case, could recommend a term of years sentence.  See 18 U.S.C. § 3593(e).  The procedural aspects of this case are governed in part by the Federal Death Penalty Act (FDPA), 18 U.S.C. §§ 3591 to 3598.

Defendant filed a number of motions attacking the procedure

followed by the government. (Docs. 140 through 146.) In a separate order, the court discussed at length the constitutionality of the FDPA and the proceedings in this case, and disposed of issues raised in Docs. 145 and 146. (Doc. 247.) This memorandum and order focuses on defendant's arguments relating specifically to the future dangerousness aggravating factor. (Doc. 142.)

## II.   THE FEDERAL DEATH PENALTY ACT

The FDPA vests discretion in federal prosecutors to determine whether the government will pursue the death penalty for offenses that authorize capital punishment.[2] 18 U.S.C. § 3593(a). If, in the event of a conviction, the government intends to seek the death penalty, it is required to give notice "a reasonable time before trial" that includes any aggravating factors prosecutors intend to prove as justifying execution. Id. If a conviction is obtained on a death-eligible offense, the trial proceeds into the second phase of a bifurcated procedure in which the government must prove a number of additional facts in order to vest the jury with discretion to recommend a death sentence.[3] Id. § 3593(b).

First, as relevant here, the government must establish that the defendant had the mental state described in at least one of four

---

[2] For a similar discussion of the FDPA's procedural requirements, see generally Jones v. United States, 527 U.S. 373, 376-79, 119 S. Ct. 2090, 2096-97, 144 L. Ed. 2d 370 (1999).

[3] Under the FDPA, this penalty phase may be tried to a jury or to the court. 18 U.S.C. § 3593(b). In this case, defendant has asserted his right to a jury trial, and in all likelihood, the parties will choose to have a jury make these sentencing determinations if defendant is convicted of murder. Accordingly, for sake of brevity, the court will describe the procedure for the use of a jury, even though it is plausible that a jury might not be used for the penalty phase.

gateway intent factors, which require proof that the defendant:

> (A) intentionally killed the victim;
> (B) intentionally inflicted serious bodily injury that resulted in the death of the victim;
> (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or
> (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.

Id. § 3591(a)(2)(A)-(D).

Next, in order for the jury to consider imposing a sentence of death, the government must prove the existence of at least one statutory aggravating factor enumerated in section 3592(c). Then, and only then, may the jury weigh the existence of any aggravating factors against any mitigating factors in order to arrive at a recommended sentence. Id. § 3593(e). The FDPA further limits the jury's discretion in this matter by stating that, once the initial conditions have been met to begin the weighing process,

> the jury . . . shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death.

Id.

The FDPA describes the aggravating and mitigating factors in section 3592. Although the FDPA lists a number of mitigating factors, it makes clear that the defendant may present, and the jury must

-4-

consider, evidence on any mitigating factor. <u>Id.</u> § 3592(a). The act enumerates several aggravating factors applicable to homicides, such as the one in this case. <u>Id.</u> § 3592(c). However, the FDPA also authorizes, but does not require, the jury to consider any other aggravating factor for which notice has been given. <u>Id.</u> These additional aggravating factors are typically referred to as non-statutory aggravating factors. <u>Jones</u>, 527 U.S. at 378 n.2, 119 S. Ct. at 2097 n.2. As particularly relevant here, the FDPA expressly authorizes the presentation of victim impact evidence, using the following language:

> The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information.

18 U.S.C. § 3593(a).

With respect to burdens of proof, the act requires the government to prove to a unanimous jury, beyond a reasonable doubt, the gateway intent factors and any aggravating factors. <u>Id.</u> §§ 3591(a)(2), 3593(c), (d). By contrast, the burden is on the defendant to prove mitigating factors, but only by a preponderance of the evidence. <u>Id.</u> § 3593(c). Moreover, any juror who concludes that the defendant has met his burden of establishing the existence of a mitigating factor may consider that factor in determining what sentence to recommend, notwithstanding the fact that other jurors may not believe that the mitigating factor has been proven - in other words, unanimity is not required for jurors to consider mitigating factors. <u>Id.</u> § 3593(d).

-5-

However, unanimity is required to make a final recommendation regarding what sentence to impose. Id. § 3593(e).

## III. FUTURE DANGEROUSNESS

In the NOI, the government alleges future dangerousness as a non-statutory aggravating factor. (Doc. 250 at 3-4.) The government further breaks down this aggravator into a number of sub-paragraphs as follows:

> **Future Dangerousness.** The defendant represents a continuing danger to the lives and safety of others in the future as is evidenced by the following:
>
> A)   The defendant has a lack of remorse for the murder of Greenwood County Sheriff Matthew Samuels;
> B)   His past criminal conduct;
> C)   The severity of the instant crimes;
> D)   The defendant was in custody of the Kansas Department of Corrections in parole status at the time these offenses were committed;
> E)   The defendant was a parole absconder at the time these offenses were committed;
> F)   The defendant's threats to others;
> G)   His stated desire to escape from prison;
> H)   His lack of desire and/or failure to comply with prison/jail/detention facility rules and regulations;
> I)   His stated desire to commit a bank robbery;
> J)   His manufacture and use of illegal drugs.

Id. (emphasis in original).

Defendant first asks the court to find that the future dangerousness factor is unconstitutional per se because it is "vague, overbroad, and irrelevant." (Doc. 142 at 3.) However, he properly concedes that his position is foreclosed by binding precedent. Indeed, it is well-settled that the Constitution permits the

-6-

consideration of evidence relating to future dangerousness at the penalty phase of a capital trial. <u>Tuilaepa v. California</u>, 512 U.S. 967, 976-77, 114 S. Ct. 2630, 2637, 129 L. Ed. 2d 750 (1994); <u>Jurek v. Texas</u>, 428 U.S. 262, 274-76, 96 S. Ct. 2950, 2957-58, 49 L. Ed. 2d 929 (1976); <u>Tillman v. Cook</u>, 215 F.3d 1116, 1130 (10th Cir. 2000).

In the alternative, defendant asks the court to strike various subparagraphs under the future dangerousness aggravating factor or otherwise order the government to provide more disclosure regarding the details supporting certain allegations related to this aggravator. (Doc. 142 at 4.)  The court will address each argument in turn.

A.  Lack of Remorse

Defendant argues that the allegations of lack of remorse provide insufficient detail for him to determine whether this portion of the future dangerousness aggravator passes constitutional scrutiny. Accordingly, he asks the court to order the government to disclose the factual basis supporting any alleged lack of remorse. <u>Id.</u> at 5.  The government responded with considerable detail, relying on defendant's own writings.  (Docs. 188 at 11-13; 231 at 3-4.)  Defendant failed to reply to these disclosures, implicitly suggesting that he is satisfied with the government's disclosures.  Nevertheless, the court will address the merits of defendant's argument.

Evidence indicating a lack of remorse for a capital crime may be admissible at the sentencing hearing. <u>See</u> <u>Zant v. Stephens</u>, 462 U.S. 862, 886 n.22, 103 S. Ct. 2733, 2747, 77 L. Ed. 2d 235 (1983) ("Any lawful evidence which tends to show the motive of the defendant, his lack of remorse, his general moral character, and his predisposition to commit other crimes is admissible in aggravation . . . ."

-7-

(Quotation omitted)).   However, aggravating factors may not be duplicative so as to unconstitutionally skew the jury's weighing process.  United States v. McCullah, 76 F.3d 1087, 1111-12 (10th Cir. 1996).   Indeed, in a previous order the court summarized the requirements that a non-statutory aggravating factor, such as the one at issue here, must meet.  "[N]on-statutory aggravating factors must be both relevant and reliable, while they may not be vague, duplicative, or perhaps, overbroad."  United States v. Cheever, __ F. Supp. 2d ___, 2006 WL 839455, *23 (D. Kan. Mar. 29, 2006). Furthermore, even an aggravator that satisfies these concerns may be excluded "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  18 U.S.C. § 3593(c).

Courts evaluating lack of remorse in the FDPA-context have generally found it inappropriate to allow such allegations to be presented as a separate non-statutory aggravating factor; conversely, those courts have just as consistently found that evidence regarding lack of remorse may be presented under the future dangerousness aggravator.  See, e.g., United States v. Cooper, 91 F. Supp. 2d 90, 113 (D.D.C. 2000); United States v. Davis, 912 F. Supp. 938, 946 (E.D. La. 1996); but see United States v. Roman, 371 F. Supp. 2d 36, 51 (D.P.R. 2005) (allowing lack of remorse as a free-standing aggravating factor).   Evidence regarding lack of remorse is ordinarily excluded unless it shows "continuing glee, boastfulness, or other affirmative conduct which indicates a pervading and continuing lack of remorse following the criminal conduct."  Roman, 371 F. Supp. 2d at 50 (citing Davis, 912 F. Supp. at 946).   In particular, evidence regarding lack

-8-

of remorse may not encroach on a defendant's right to remain silent. Id. (citing Cooper 91 F. Supp. 2d at 112-13).

Here the government claims to have evidence from defendant's own jailhouse writings in which he expresses boastfulness and glee about his having killed Sheriff Samuels and fired on the other law enforcement officers. (Doc. 188 at 11.) Speaking about these events, defendant allegedly states, "I'd do it again in a heartbeat" and "I'm still an outlaw until they bury me." Id. at 11-12. He brags about his shootout with law enforcement, and claims that the only reason he did not kill some of his other enemies is because he "had to shoot the sheriff instead!" Id. The government provides other profanity-laden quotes, but their import is the same as that which has already been discussed. Id. at 11-13; (Doc. 231 at 3-4.)

The court finds that at least some of these writings indicate defendant's continuing glee and boastfulness about the alleged murder. Moreover, his was not an isolated statement, but rather a series of statements made to different individuals over some period of time following defendant's arrest. Under these circumstances, the question of defendant's motive for making these statements is a matter for the jury. The government having responded in compliance with defendant's request for disclosure, defendant's motion on this point is otherwise moot

B.  Past Criminal Conduct

Defendant next criticizes the government's reference to his past criminal conduct as evidence of future dangerousness. (Doc. 142 at 5-6.)  He asks the court to order the government to produce all evidence that it has regarding these other crimes.  In its response,

the government did so (Doc. 188 at 13-16.)  Defendant made no further requests regarding this issue.  The court therefore finds this argument moot.

In the alternative, however, defendant further asserts that any evidence of past criminal conduct must be limited to that which is relevant to life in a prison setting since, if not sentenced to death, defendant will be sentenced to life without parole.  (Doc. 142 at 5-6.)  As a factual matter, the last portion of this assertion is inaccurate.  Defendant is charged with two counts of murder.  If convicted under Count Six, defendant will be sentenced to life without parole or death.  18 U.S.C. § 1512(a)(3)(A).  On the other hand, if convicted under Count Five, defendant may be sentenced to death, life without parole, or any term of years.  18 U.S.C. 924(j)(1).  Hence, if defendant is convicted under Count Five but acquitted under Count Six, it is legally conceivable that defendant could be convicted of murder, yet sentenced only to a term of years.  In that event, evidence regarding his future dangerousness could permissibly touch upon his dangerousness to society at large.

The real question is whether the scope of evidence regarding defendant's past criminal conduct must be circumscribed when the only sentencing options are life in prison or death.  Evidence of past criminal conduct is generally admissible in a capital proceeding in order to show future dangerousness.  Simmons v. South Carolina, 512 U.S. 154, 163, 114 S. Ct. 2187, 2194, 129 L. Ed. 2d 133 (1994) (plurality opinion).  However, defendant relies on United States v. Llera Plaza, 179 F. Supp. 2d 464, 487 (E.D. Pa. 2001), for the proposition that, under the FDPA, evidence of future dangerousness is

-10-

admissible only if relevant to life in a prison setting.   (Doc. 142

at 6 n.18.)   <u>Llera Plaza</u> observed that

> [l]ower courts have taken the Supreme Court's
> discussion in <u>Simmons</u> to mean that, in the FDPA
> context, government arguments regarding "future
> dangerousness" should be limited to the dangers
> posed by the defendants while serving a life
> sentence in prison.  See <u>Gilbert</u>, 120 F. Supp. 2d
> at 154; <u>Cooper</u>, 91 F. Supp. 2d at 111; <u>United
> States v. Peoples</u>, 74 F. Supp. 2d 930, 931 (W.D.
> Mo. 1999).   This court reads <u>Simmons</u> in the same
> way.   Accordingly, if there is a sentencing
> phase, the jury will be instructed that it is to
> evaluate the defendants' "future dangerousness"
> in the context of life imprisonment, and the
> government will be requested to limit its
> sentencing phase evidence to that which is
> relevant to a context of life imprisonment.

<u>Id</u> at 487-88.

The court disagrees with <u>Llera Plaza</u>'s interpretation of <u>Simmons</u>.

First, a review of the cases that <u>Llera Plaza</u> cites in support of this

interpretation of <u>Simmons</u> reveals that those cases do not rely on

<u>Simmons</u> in this regard.   For instance, neither <u>United States v.

Gilbert</u>, 120 F. Supp. 2d 147 (D. Mass. 2000), nor <u>Peoples</u> even cited

<u>Simmons</u>.   Although <u>Cooper</u> did cite <u>Simmons</u>, it was only for the

proposition that the jury was entitled to know that, if convicted and

sentenced to life imprisonment, the defendant would never be released.

91 F. Supp. 2d at 111.   In fact, <u>Cooper</u> noted that this issue was

uncontested.   <u>Id.</u>   While these cases arguably stand for the

proposition that when a life sentence carries no possibility of

release, evidence of future dangerousness is only relevant when it

applies to life in a prison setting, they do not support the notion

that <u>Simmons</u> compels such a rule.

This conclusion leaves <u>Llera Plaza</u> standing alone in its

-11-

interpretation of Simmons.  But a close reading of Simmons suggests a contrary result.  In Simmons, a fractured Supreme Court overturned a South Carolina death sentence where the trial court refused to inform the jury that, if sentenced to life in prison, the defendant would never be eligible for parole.  Simmons, 512 U.S. at 156, 114 S. Ct. at 2190 (plurality opinion).  In that case, the prosecution argued to the jury that it should consider the defendant's future dangerousness in deciding whether to recommend a death sentence.  Id. at 157, 114 S. Ct. at 2190-91.  However, the evidence regarding future dangerousness appears to have been limited to showing only that the defendant was dangerous to elderly women.  Id. at 157, 114 S. Ct. at 2190.

In reversing the death sentence, a majority of the Court found that the proper remedy was to allow the defendant to rebut the government's evidence of the defendant's future dangerousness to elderly women by showing that, if given a life sentence, defendant would never be released from prison (and thus, he would never have access to elderly women).  Id. at 168-69, 114 S. Ct. at 2196 (plurality opinion of Blackmun, Stevens, Souter, and Ginsburg, JJ.); id. at 177, 114 S. Ct. 2200-01 (O'Connor, Kennedy, JJ., and Rehnquist, C.J., concurring).  By contrast, the Court did not even hint that evidence regarding future dangerousness should be limited to life in a prison setting.  Simmons would seem to have presented a perfect opportunity to do so, given that the evidence of future dangerousness appeared to focus exclusively on the defendant's danger to society if he were freed from incarceration.  Moreover, the requirement that aggravating factors and their supporting evidence be relevant to the

question of who should live and who should die is not exclusive to the FDPA, see Arave v. Creech, 507 U.S. 463, 474, 113 S. Ct. 1534, 1542, 123 L. Ed. 2d 188 (1993); accordingly, Simmons could have utterly precluded evidence of the defendant's future dangerousness outside prison on the basis that it was irrelevant to someone facing life without parole.  This Simmons did not do.  Thus, the court concludes that Simmons does not compel the result that defendant requests here. Accord United States v. Bernard, 299 F.3d 467, 482 (5th Cir. 2002) ("Simmons does not hold that future dangerousness is irrelevant to a jury's sentencing decision when the defendant will be imprisoned indefinitely, but instead requires that this aggravating factor be explained to the jury in the context of the defendant's ineligibility for parole"); United States v. Allen, 247 F.3d 741, 788-89 (8th Cir. 2001), vacated 536 U.S. 953, 122 S. Ct. 2653, 153 L. Ed. 2d 830 (2002) (remanding for reconsideration in light of Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002)), and aff'd on reh'g 357 F.3d 745 (8th Cir. 2004) (en banc).

Be that as it may, the court is hesitant to rely on Simmons' silence regarding relevance as a wholesale endorsement of the concept that evidence related to future dangerousness in a free society is always relevant, even when the only sentencing alternative is life without parole.  Considering the unpredictable and ever-changing face of capital jurisprudence, the wiser approach would appear to be to scrutinize the relevance of any future dangerousness evidence that would be inapposite in a prison setting.  See Cheever, __ F. Supp. 2d at __, 2006 WL 839455, *3 (D. Kan. Mar. 29, 2006).

The supporting evidence disclosed by the government all relates

-13-

to defendant's prior acts of violence.  (Doc. 188 at 13.)  In 1999, defendant was adjudicated a juvenile offender as a result of a battery against another high school student.  In 2000, defendant was convicted of attempted aggravated robbery during which he severely beat the store's clerk.  These incidents, while reprehensible, are not as serious as the defendant's history in <u>United States v. Bernard</u>, 299 F.3d at 482.  Standing alone, the incidents seemingly shed little light on whether defendant would present a danger to guards and inmates during a lengthy or life prison sentence, or to the public should defendant be sentenced to a term of years.[4]  At this juncture, the court will take under advisement the matter of defendant's criminal record as evidence of future dangerousness until the jury has reached a verdict on the guilt phase of the trial.

C.  The Severity of the Crime

Defendant asks that this allegation be stricken from the NOI on two alternative grounds: that it is unconstitutionally duplicative with other aggravators; or that it is unconstitutionally vague.  (Doc. 142 at 7-8.)  The first argument assumes that the jury will be directed to consider conduct highlighted by other aggravating factors, while the second argument is based on the jury having been instructed not to consider conduct covered by the other aggravating factors.  <u>Id.</u> In its response, the government cites no authority in support of this factor, but merely highlights how defendant shot the sheriff and then

---

[4] Given the facts presently known to the court regarding the circumstances of the crime and defendant's history, it seems likely that if a jury should recommend that defendant be sentenced to a term of years, the term would be a long one.  But it is not appropriate to speculate on the possible verdict of a jury in this or any other case.

-14-

shot at the deputies who tried to pull him from the house.  (Doc. 188 at 16.)

The court finds that the facts upon which the government relies create an unwarranted risk of double-counting in violation of <u>McCullah</u> 76 F.3d at 1111-12.  The jury will already be considering a great deal of this evidence in evaluating the murder of a law enforcement officer aggravating factor and the multiple attempted killings aggravator. The court finds that asking the jury to also consider the severity of the crime, when the focus of the supporting evidence is precisely the fact that defendant was shooting at the deputies as they tried to rescue the sheriff, creates a significant risk of double-counting aggravators.  Furthermore, the court finds that attempting to explain the subtle distinctions necessary to parse between these other aggravating factors and the severity of the crime aggravator would likely lead to jury confusion, thereby warranting exclusion under 18 U.S.C. § 3593(c).  Accordingly, subparagraph (C) under the future dangerousness aggravating factor, which relates to the severity of the crime, is hereby STRICKEN.

D.  Parole Status and Parole Absconder

Defendant claims that these allegations are legally irrelevant. The government cites no authority to the contrary.  Instead, the government relies on the legal technicality that a person on parole is considered to be in the custody of the Department of Corrections, even though he has been released from prison.  (Doc. 188 at 17.) Accordingly, the government argues that defendant was technically in custody when he allegedly committed the crimes for which he is now charged.

-15-

Although the government's relevance argument is unclear, it appears that these allegations are intended to show that defendant has committed acts of violence while "in custody," and would therefore be dangerous in a prison setting.  The court finds this argument tenuous at best and, at worst, an open invitation to reversal in the event the jury recommends a death sentence.  While, at the time of the alleged murder, defendant may have been "in custody" from a legal perspective, as a factual matter he was a free man.  The court finds that attempting to explain this nuance to a jury, and asking the jury to apply this legal fiction to the facts of the case will likely be confusing, and should be excluded under section 3593(c).  Subparagraphs (D) and (E) are therefore STRICKEN from the future dangerousness factor in the NOI.

E.  Defendant's Threats to Others and His Stated Desire to Escape from Prison

Defendant next challenges subparagraphs (F) and (G) under the future dangerousness aggravator, which relate to defendant's having made threats to other people and his compelling desire to escape from prison.  (Doc. 142 at 9-10.)  He asks that these allegations be stricken from the NOI.  Id. at 11.

The government has responded by describing a litany of threats that defendant made to others.  (Docs. 188 at 17-20; 231 at 2-3.) Some of the more colorful examples come from a letter in which defendant threatens Billy Nowell, a former co-defendant who was cooperating with the government:

> Billy Gene [Nowell] is a dead fucker though . .
> . I don't care where he goes, he[']s fucked. . .
> . As soon as I seen [Nowell] was there and that

-16-

>          . . . grin on his . . . mouth I should have
>          fucked him off.

(Doc. 188 at 17.)  In another letter, defendant continued his ranting

against jail personnel:

>          You gotta get me out of here quick before I
>          attack one of these guards!  Fuck code for now!
>          I gotta get out of here.  Either I do the hostage
>          thing or the wall gets blown out . . . pick one!
>          Thems [sic] the only two I can think of.  I told
>          the nigger guard I['] going to kill him when I
>          get a hold of him and they['] ve been acting weird
>          ever since.  Now they are really being bitches!
>          Gonna have to take one out just to get some
>          respect . . . Hootie Hoo!

Id. at 18.

     In yet another example, defendant wrote threatening statements

to another inmate, Nathan Fife, who was cooperating with the

government.  Defendant allegedly passed a note to Fife, which was

written on a police report detailing Fife's cooperation with the

government on matters relating to defendant.  The note said, "Nathan

Fife is a bitch made snitch.  He ain[']t no outlaw . . . he's a fake.

And I fucked his old lady!  Ha-Ha!"  Id.  On a succeeding page of the

police report defendant wrote:

>          Interview between Woodson County Sheriff & The
>          bitch made snitch Nathan Fife!!!  Wish I had the
>          rest of the interview!  Hard telling who else he
>          told on huh?

Id.  The government's response details additional threatening

statements, but those need not be repeated here.

     In Davis, the court evaluated a non-statutory aggravating factor

alleging that the defendant was "a continuing threat to society."  912

F. Supp. at 944.  For all practical purposes, this is just another way

to allege future dangerousness.  In considering allegations that the

-17-

defendant made threats to others, and that those threats supported this aggravating factor, the court cautioned that "[t]hreatening words and warped bravado, without affirmative acts, are simply too slippery to weigh as indicators of character; too attenuated to be relevant in deciding life or death; and whatever probative value they might have is far outweighed by the danger of unfair prejudice and confusion of the issues." Id. at 945.

Rephrased within the framework already articulated for evaluating non-statutory aggravating factors, Davis' conclusion was that simple threats were not reliable ("simply too slippery"), not relevant, and their probative value was outweighed by the danger of unfair prejudice and jury confusion.  That may have been the case in Davis, but the court finds that the allegations here go far beyond "threatening words and warped bravado."  Id.  Instead, viewing the alleged acts of this defendant in their totality, the court finds that this is a man who at least attempts to carry out some of his threats.

For instance, by his own admission in two of his letters, when defendant became aware that someone had called the sheriff, and that a confrontation was eminent, he stated that he was not going to run, but was essentially going to shoot it out with law enforcement. (Doc. 188 at 12.)  As the solemn facts of this case suggest, that is precisely what he did.  As another example, following his threats to Nathan Fife, defendant somehow managed to escape from his cell in one part of the Lyon County Jail and traverse through to another part of the jail where Fife was housed.  Upon his arrival in Fife's housing pod, defendant allegedly called out, "Where is Nathan Fife?" (Doc. 231 at 2.)  Other inmates directed defendant to Fife's cell.

-18-

Fortunately, defendant was apprehended at Fife's cell door.  Id.

While the court does not now rule that the government's proffered evidence of threats will be admissible, the court concludes that at least some of those threats go well beyond "warped bravado," and are supported by affirmative acts suggesting that defendant was willing to carry out his threats.  Such evidence appears to be relevant to the issue of future dangerousness, and its reliability is bolstered by defendant's own words and his own actions.  Accordingly, defendant's motion to strike the subparagraph alleging threats to others is taken under advisement until after the jury returns its verdict in the guilt phase and the court has a better idea (probably by way of a hearing outside the jury's presence) regarding the evidence that the government seeks to offer.

With respect to evidence regarding defendant's desire to escape from prison, the government disclosed defendant's own statements in his jailhouse letters.  In these writings, defendant repeatedly affirms his steadfast intent to escape, regardless of how long it takes, and even requested that his former girlfriend help him to do so.  (Docs. 188 at 18; 231 at 2-3.)

The court finds that evidence showing a defendant's intent to escape is highly relevant to his future dangerousness.  An escape attempt, like an armed robbery or a burglary of an occupied residence, carries with it the inherent and considerable risk of violent confrontation and injury to others.  United States v. Gosling, 39 F.3d 1140, 1142 (10th Cir. 1994).  Moreover, the reliability of this evidence is enhanced by defendant's conduct in apparently escaping from his cell in the Lyon County Jail.  Defendant's motion to strike

-19-

this allegation is accordingly DENIED.

F.  Failure to Comply with Prison and Jail Regulations

Defendant asks the court to strike the allegation that he has failed to comply with prison and jail regulations.  Specifically, defendant notes that during a prior prison term, he violated prison rules by bringing cigarettes into the institution.  (Doc. 142 at 10.) Defendant asserts that such minor violations are not relevant to the question of his future dangerousness or the overarching question of whether he should be put to death.

The government counters with other evidence of defendant's violations of institutional rules.  This evidence includes his escape from his cell in the Lyon County Jail, defendant's assaulting a detention officer in the Sedgwick County Jail, and his physical struggles with other officers who attempted to return him to his cell. (Doc. 188 at 18-20.)  The government also alleges that defendant was found with a weapon in his possession while at the Sedgwick County Jail.  Id. at 20.

The court finds that minor violations of institutional rules are not relevant to the question of defendant's future dangerousness and shall not be admitted.  On the other hand, evidence of violations related to violence, escape, possession of weapons, and the like are highly relevant and will not be excluded on that basis.  Since the government appears to have evidence that, if admitted, would legitimately support allegations that defendant violated institutional rules in a way that bears on his future dangerousness, defendant's motion to strike this subparagraph is taken under advisement pending the jury's verdict in the guilt phase and a more complete picture of

-20-

the evidence the government seeks to offer.

G.   Stated Desire to Rob a Bank and Manufacture and Use of Illegal Drugs

Defendant's final challenge to the subparagraphs elaborating on his future dangerousness relates to claims that he has a desire to rob a bank and that he manufactures and uses illegal drugs.   Defendant simply asserts that these allegations have no bearing on his dangerousness in prison.   (Doc. 142 at 11.)   The government has countered with defendant's specific statements regarding his compelling need to rob a bank and his knowledge of multiple ways to manufacture methamphetamine.   (Doc. 188 at 21.)

As previously discussed, if the jury convicts defendant on Count Five, but acquits him on Count Six, defendant may be sentenced to a term of years, thereby creating the possibility that he might someday be released from prison.   In the event that the jury so finds, there is no basis to limit evidence of future dangerousness to life in a prison setting.   It is well-settled that a defendant's likelihood of committing additional criminal acts if released from prison is an appropriate matter for a capital jury to consider when making a sentencing recommendation.   Tuilaepa, 512 U.S. at 976-77, 114 S. Ct. at 2637 (citing Jurek, 428 U.S. at 269, 96 S. Ct. at 2955).

On the other hand, if defendant is convicted under Count Six, the court will adhere to its decision that only evidence relevant to life in a prison setting shall be admitted.   The court finds that defendant's desire to rob a bank and his ability to manufacture methamphetamine have no genuine relevance to his dangerousness in prison.   Accordingly, only if the jury should convict on Count Five,

acquit on Count Six, and recommend a term of years will the court consider allowing the government to introduce evidence supporting these allegations.

IT IS SO ORDERED.

Dated this  9th  day of May 2006, at Wichita, Kansas.


                                    s/ Monti Belot
                                    Monti L. Belot
                                    UNITED STATES DISTRICT JUDGE